FOLDING FURNITURE WORKS, INC., Appellant, vs. WISCON-SIN LABOR RELATIONS BOARD, Respondent.

*February 7—June 30, 1939.*

172

*A. L. Smongeski* of Stevens Point, for the appellant.

For the respondent there were briefs by the *Attorney General, James Ward Rector,* deputy attorney general, *N. S.*

*Boardman,* assistant attorney general, *N. P. Feinsinger,* special counsel, and *Mary Eschweiler* of Madison of counsel, and oral argument by *Mr. Feinsinger.*

On the motion for rehearing a brief was also filed by *Padway, Goldberg & Tarrell,* attorneys for the Wisconsin State Federation of Labor, as *amici curiæ.*

The following opinion was filed May 9, 1939:

Fowler, J. This action involves a proceeding before the Wisconsin Labor Relations Board under ch. 51, Laws of 1937, which constitutes ch. 111, Wis. Stats., entitled "Labor Relations." The act is in its language in nearly all respects identical with the federal 1935 National Labor Relations Act, 29 USCA, § 151 *et seq.*

The petitioner is organized as a corporation, although it seems to be a one-man concern. J. S. Worzalla, secretary and treasurer of the corporation, is the man. It has been operating in Stevens Point for about twenty years. Its issued stock consists of thirty shares held by Worzalla, five held by his wife, and three by his wife's sister. Mrs. Worzalla is president of the company. At the time the matters herein involved culminated, the petitioner, or the defendant, was employing thirty-four men in production, thirty-two of whom were discharged on June 25, 1937. In the spring previous a labor union was organized in Stevens Point named United Brotherhood of Carpenters and Joiners, Local No. 1805, of Stevens Point, which was affiliated with the American Federation of Labor. The thirty-two employees referred to and one other employee of defendant joined this union. These men comprised all of the production employees except a son of Worzalla. The employees selected a bargaining committee, consisting of two employees of the company and the president of the local union who was not its employee. This committee made a demand on Worzalla to meet with them for collective bargaining. Worzalla acceded

to the demand, although at his instigation there was some delay in fixing the first meeting. The first meeting with the committee was held at Worzalla's house on the evening of May 30th. The committee proposed as basis for bargaining a contract which had been negotiated by bargaining between another local manufacturing company similar to the defendant company and its employees. The proposed contract was for a minimum wage of forty cents per hour, which was higher than the defendant company was paying. Worzalla said he could not pay any increase at present. That his business would not permit it. He said he thought if required to pay such wages he would have to transform his plant into a warehouse. It was engaged in manufacturing furniture. The contract was submitted to Worzalla and he was asked to go over it section by section. He read part of it. He was asked to talk about each article as he read it. He listened as it was read section by section and was "interested in it" but made no comments. At the finish of the reading he said he would have to think it over. He said a fire in the plant which occurred five or six years before had resulted in great loss and that he had not been able to catch up.

The next meeting was held on June 20th, also at Worzalla's house. Mr. Hathaway, first vice-president of the State Council of Carpenters, which is connected with the American Federation of Labor, was present to assist in the bargaining and took the leading part on behalf of the committee. The committee again suggested taking up the proposed contract section by section, but Worzalla said it would be no use as it would have to be changed altogether. Worzalla did not indicate the general nature of any contract he would sign. He was asked to make some proposal but made none. He wanted to postpone bargaining until October when he said he could tell better what he would be able to do; said business at the time was uncertain; figured by September or October it would improve so he might be able to meet the

demands of the union; proposed that the men keep on under present arrangements until October 1st and he would then bargain with them; said he would see what he could do by that time and he could probably meet the demands at a conference then; mentioned giving wage increases on July 1st to individual employees as he had theretofore promised, but did not say how much or to whom; said he had given raises to individuals and intended to give more. Hathaway brought him to the point of agreeing to write a letter, but there is disagreement between Worzalla and the committee and Hathaway as to the nature of the letter he was to write. The employees claim the letter was to tell what his decision was on the contract proposed by the committee. Hathaway concedes that Worzalla did discuss some features of the proposed contract at this conference, but claimed it would not be possible for him at that time to give an answer as to the proposed scale, but he would go over his books and see what adjustment he could make in addition to what he had in mind. Hathaway asked him to write a letter to the committee specifying increases he would give and stating his objections to any part of the proposed agreement, and directed the committee to lay the proposal before the union and give Worzalla their reply. Worzalla explained the cases of some of the employees who were mentally deficient and could not do full work. Hathaway expected at the close of the meeting that some kind of offer would be made by Worzalla by way of wage adjustment.

On the following day Worzalla wrote a letter which he contends is according to the understanding reached at the meeting and the committee and Hathaway contend is not. The letter was addressed to Local Union 1805. It started out: "In accordance to a mutual understanding with your committee—further collective bargaining is postponed until October 1, 1937." According to the testimony of the committee and Hathaway there was no such mutual understanding. The letter then states that it was also "mutually under-

stood," which the employees deny, that a vote of the members of the union employed by the company should be taken within the next few days to determine whether they were "willing in meantime and until the further collective-bargaining negotiations are concluded" to keep at work at existing wages, on understanding that "unless satisfactory to the majority" of the members so to work, the plant would cease regular factory operations. It was to be further understood that unless on or before June 25th, the company received information that the vote of the members was so to continue work, then "in accordance to understanding" the company would "close down" its plant on or about July 1st. But if the company received a favorable report, that would have no effect upon the advances the company had in mind to give some employees on July 1st, and perhaps others later as the company should see fit "accordance to our ability to do so." A copy of this letter was sent to all employees.

To this letter the employees sent the reply on June 24th that "the union employees of the Folding Furniture Works Co., Inc., have voted unanimously that no action can be taken until the latter part of next week." Their reason for not taking action on June 25th was that the members wished to consult Hathaway.

On June 25th Worzalla called the members of the union in his employ together at the plant. He told them if they wanted to work they could stay and if they didn't want to work they could leave. He asked the men if they wanted to work under the same conditions until October 1st. They did not answer. The men did not come back the next day. They wanted an immediate increase of wages of some amount, and did not come back because they could not get it. Worzalla told them that if they would not vote on his proposition they were no longer employees of the company.

At this point Mr. Brophy, a representative of the board, and Fr. Haas, a member of it, representing the board, entered the picture and sought to adjust matters between the men

and Worzalla. They, acting with and for the bargaining committee, proposed a raise of five cents an hour until October 1st, and another five-cent raise then and another in February. Worzalla claimed he could not pay such a raise without losing money. He claimed the reason he wanted the men to agree to stay until October was that he had to buy materials if they stayed and would not have to if they quit. He also said he was going to buy new machinery to the amount of $15,000 to $25,000, and gave this as a reason why he could not afford a raise of wages. Fr. Haas asked him if he would agree to raise wages seven cents an hour if the men would agree to stay a year at that wage, but he insisted that he could not pay that wage. He also claimed that he would have to pass up orders he had unless the men stayed at work.

Adjustment of differences between Worzalla and his employees not having been reached through the intervention of the representatives of the board, on August 2, 1937, the president of the local labor union filed charges with the board and requested the board to take action against the company. The charges were that the company had engaged and was "engaging in unfair labor practices" within the meaning of subs. (3) and (5) of sec. 111.08, Stats., *"in that"* it had done certain specified things. The statutes mentioned in the charges read:

"111.08. *What are unfair labor practices.* It shall be an unfair labor practice for an employer: . . .

"(3) By discrimination in regard to hire or terms of tenure or other conditions of employment to discourage membership in any labor organization or to encourage membership in any company union. . . .

"(5) To refuse to bargain collectively with the representatives of his employees where such representatives are the exclusive representatives under the provisions of section 111.09."

The specific charges of the violations of these statutes were that: The company had violated sub. (5) by refusing to bargain collectively with the bargaining committee of its

employees; that the company had violated sub. (3) "by discrimination in regard to hire or terms of tenure or other conditions of employment to discourage membership in any labor organization," to wit, the discharge of thirty-two production employees on June 25th, all members of the local union, for the purpose of the discouragement of union organization; and that the company had violated sub. (3) "by discrimination in regard to hire or terms of tenure or other conditions of employment" by sending the letter above referred to each employee who was a member of the local union "containing phrases designed to intimidate and in other ways discourage" membership in the local union.

On the filing of these charges the board on August 10, 1937, served upon the company a complaint alleging that "since June 21, 1937, the company violated sec. 111.08 (5), Stats., by refusing to bargain collectively; violated subs. (1) and (3) of sec. 111.08 by discharging on June 25th the thirty-two employees because they would not accede to terms of employment dictated by the company, but sought to bargain on such terms; violated subs. (1) and (5) of sec. 111.08, Stats., by refusing to bargain with its employees; and violated subs. (1) and (3) of sec. 111.08 on June 21st by sending to its employees the letter above referred to because the language of said letter was such as to interfere with, restrain, and coerce employees in the exercise of their organizational rights as secured by sec. 111.07, Stats., and, to discourage membership in the local union.

Sub. (1) of sec. 111.08, Stats., referred to in the complaint reads:

"It shall be an unfair labor practice for an employer:

"(1) To interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 111.07."

Sec. 111.07, Stats., referred to in sub. (1) of sec. 111.08 reads:

"*Rights of employees.* Employees shall have the right of self-organization, to form, join or assist labor organization, to bargain collectively through representatives of their own

choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection. . . ."

The statute under which the board acted in making its order is sec. 111.10 (3) and so far as material here reads as follows:

"(3) A full and complete record shall be kept of all proceedings had before the board, or any member of, agent or agency thereof in any hearing, and all testimony shall be taken down by the stenographer appointed by the board. If upon this record the board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this chapter. Such order may further require such person to make reports from time to time showing the extent to which he has complied with the order."

On the complaint above stated, testimony was taken before a hearing chairman on September 1st and 2d. The testimony in great part was as to conduct of Worzalla antedating the occurrences laid in the charges and complaint as basis for the action. The findings are subject to the same criticism as those in *Wisconsin Labor R. Board v. Fred Rueping L. Co.* 228 Wis. 473, 494, 279 N. W. 673. What are stated as conclusions of law are largely conclusions of fact. No particular form of findings is required, but the findings should state the board's conclusion of ultimate fact respecting the acts of the defendant charged in the complaint, as distinguished from a statement of the evidence itself, or particular items of it, state the "unfair labor practices" under the Labor Relations Act the board considers these acts violated, if any, and order to be done what, if anything, the board considers should be done by the defendant because of the violations found, limit-

ing "affirmative action" to what is considered by the board reasonably necessary to "effectuate the policies" of the act.

We consider that the evidence falling strictly within the issues made by the charge and the complaint show that the company was guilty of unfair labor practices as found by the board in two respects at least. It denied employees the rights secured to them by sec. 111.07, Stats., to bargain collectively and to engage in concerted activities. We perceive no substantial support for the finding of discouraging membership in the local union "by *discrimination* in regard to hire or tenure of employment." All employees were treated alike so far as we can discover. Other findings are based on evidence of matters that occurred prior to the occurrence of the things charged as basis for the action.

On the basis of findings made the board ordered the company to:

"(1) Cease and desist from:

"(a) Discouraging or attempting to discourage membership in Local 1805, United Brotherhood of Carpenters and Joiners, by discrimination in regard to hire or terms of tenure of employment, or any other condition of employment;

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to join or assist said Local 1805, or to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection;

"(c) Refusing to bargain collectively with said Local 1805 as the exclusive representative of respondent's production employees.

"(2) Take the following affirmative action which the board finds will effectuate the policies of the act:

"(a) Post notices in conspicuous places in its plant for a period of not less than thirty days, stating that the respondent will cease and desist from the act enumerated in (1) above, and from interfering with, restraining, or coercing employees in the exercise of rights guaranteed in section 111.07 of the act;

"(b) Offer to Stanley Pionek and the thirty-one other production employees who were discharged on June 25, 1937,

immediate and full reinstatement to their former positions, or equivalent employment on a full-time basis with all rights and privileges previously enjoyed as employees;

"(c) Make whole said Stanley Pionek and the additional thirty-one production employees discharged on June 25, 1937, for any loss of pay they have suffered by reason of such discharge, by payment to them of a sum equal to that which they would normally have earned as wages at their old positions with respondent, from the date of their discharge to the date of such offer of employment as described in paragraph (b) above, less the amount earned by each during such period;

"(d) Upon request, bargain collectively with Local 1805, United Brotherhood of Carpenters and Joiners, as the exclusive representative of its production employees with respect to rates of pay, wages, hours of employment, and other conditions of employment;

"(e) Notify the Wisconsin Labor Relations Board in writing within ten days from the date of this order what steps the respondent has taken to comply herewith."

As the evidence properly received by the hearing chairman warrants the inference of unfair labor practices in respect of the two matters above mentioned, it warrants the main part of the "cease and desist" portion of the order made, and the order of the board would be affirmed but for the matters hereinafter discussed, one of which, at least, is of such nature and import as in our judgment to require reversal of the judgment. It will be noted that the order contains the "affirmative" provision that the company should offer to reinstate the thirty-two discharged employees on full-time basis and with all rights existing at the time of their discharge and with back pay up to the time the offer should be made, less earnings in the meantime. Such offer would necessarily be made after the company received notice of the order, and the order carried back pay from June 25th to the time in the future when the company should make its offer. We consider that requiring an offer to reinstate the men was proper, and an order for payment of a reasonable amount of back pay, to those

who accepted the offer, based upon what was deemed necessary to "effectuate the policies" of the act, would have been proper. But the order made was based on an erroneous view of the statute. The board's power to require back pay is limited to the amount that is necessary to "effectuate the policies" of the labor act. Sec. 111.10 (3), Stats. We consider that there is necessarily no relation between the amount of back pay required that is reasonably necessary to "effectuate the policies" of the act and the *time* when an offer to reinstate the men is or should be made. Back pay cannot be ordered beyond the time an unconditional offer to reinstate is made. In absence of such an offer by the defendant the amount that is reasonably necessary to "effectuate the policies" of the act is the fact that must control the amount. The amount so necessary is the same regardless of when it is made if it is made. The board should have allowed back pay to the men accepting an offer of reinstatement for such reasonable time as it considered necessary to effectuate the policies of the act, if it considered it was necessary to "effectuate the policies" of the act to require payment of back pay. The basis of the determination of the amount by the board apparently was that the discharged men were entitled to wages until they should be reinstated. This is an erroneous conception of the board's power to order back pay. It was held under the National Labor Relations Act that back pay cannot be ordered as a reward to employees, but only as a penalty against the employer as a means of preventing unfair labor practices. *National Labor Relations Board v. Carlisle Lumber Co.* (9th Cir.) 99 Fed. (2d) 533. Back pay may not be ordered under the rule of that case unless such order will "effectuate the policies of the National Labor Relations Act." The Wisconsin act contains the same provision. Sec. 111.10 (3), Stats. The ruining of business enterprises and the confiscation of their plants is not the policy of the Wisconsin Labor Relations Act. Although the order recites

that the amount of back pay ordered is necessary to "effectuate the policies of the Wisconsin Labor Relations Act" we consider that the amount ordered is unreasonable and the order as to the amount must be set aside. The statement of the federal court above quoted from the *Carlisle Case* to the effect that back pay is a penalty is, strictly speaking, not correct but the idea back of the statement is entirely so. The supreme court of the United States in *Consolidated Edison Co. v. National Labor Relations Board,* 305 U. S. 197, 235, 236, 59 Sup. Ct. 206, 83 L. Ed. 126, held upon this point that—

"This authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the board be of the opinion that the policies of the act might be effectuated by such an order.

"The power to command affirmative action is remedial, not punitive, and is to be exercised in aid of the board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the act."

The order for back pay was beyond the power of the board to make because of the enormity of the amount ordered. The amount required by the order is approximately $100 a day less earnings since discharge, if any. The testimony before the hearing chairman was taken on September 1st and 2d. The board's order was dated October 27th. Thus the $100 a day was running approximately fifty work days according to the board's order before the company had any opportunity to comply with the order and thus stop its running. The amount of back pay ordered should not depend on the time the board took to decide the case. That time has no relation to the amount necessary to effectuate the purposes of the act. According to the board's order $5,000 accumulated between the taking of the testimony and the

date of the order. Six thousand dollars had accumulated from the discharge to the time of the taking of the testimony. These two items were apparently enough to spell ruin to a company with so small capital as the instant company apparently had. This is stated not as an exact or necessarily an approximate amount of the back pay imposed on the company by the board's order, but to suggest that the amount to which the company would be mulcted by enforcement of its order as to back pay according to its terms is entirely beyond the company's ability to pay. It appears from statements in the briefs that the board pending the contest of the validity of its order has assessed the amount of back pay and the company has brought an action to review the assessment which is now pending in the circuit court. What that assessment is we do not know, but we do know that if the company has been assessed according to the terms of the board's order, the board has penalized the company to an extent that in our opinion is unreasonable and not necessary to effect the policies of the act. This is true even if the company reinstated the men immediately after the board made the order for their reinstatement.

We are not unmindful that the amount of back pay ordered in the *Carlisle Case, supra,* was $187,000, and that a petition for *certiorari* from the circuit court of appeals was denied by the supreme court of the United States. It is claimed by counsel for the board in a letter just received that the lumber company claimed in its petition for *certiorari* that the enforcement of the order would result in its bankruptcy. We do not know upon what authority counsel makes this statement. Such fact does not appear in the court's report of the denial of the writ. The opinion of the court in the case cited does not disclose the worth of the lumber company. Whatever it may be, we cannot believe that the indirect confiscation of the company's entire property ordered by the board in the instant case is necessary to "effectuate the policies" of the Wisconsin Labor Relations Act.

Counsel also in his letter just referred to cites a statement in *Texas Electric R. Co. v. Eastus* (D. C.), 25 Fed. Supp. 825, 833, to the effect that the courts cannot save railroads from the effect of a constitutional statute although the effect of the application of the statute is to destroy the road. The point of the holding is thus stated by the court:

"It is not within our [the court's] power to save if it was within the power of congress to destroy."

It is obvious that the order for back pay in the instant case is not the application of a legislative act to the company. We are dealing with the order of an administrative board. The board fixed the amount of the payment, not the legislature, and it is thus the board and not the legislative act that would destroy the company.

If the amount of an order of the board for back pay to discharged men were to be based upon the date of an offer of reinstatement, the instant order was improper because it did not take into consideration the fact of offers by the company to take the men back made during the proceedings before the hearing chairman. Worzalla testified that he had prior to this hearing made five offers to take the men back. He testified that he made such an offer to Mr. Brophy, a representative of the board on August 5th. There is no dispute of this and one of the bargaining committee corroborates it. This witness says he knew from Mr. Brophy that the company had offered to take the men back, but that the men wouldn't go back unless they received an increase in pay. No offer of reinstatement on the status existing at the time of the discharge made before the hearing would have been accepted by the men. There is much testimony to this effect and none to the contrary. From the testimony in the record relating to the matter it might properly be inferred as found by the board that the offers prior to September 1st were conditioned on the men staying until October 1st, and postponing bargaining to that time. But Worzalla testified

before the hearing chairman that he had offered the day before to take the men back, and this is not denied. No conditions appear to have been attached to this offer. The record also shows that Worzalla said on the hearing that he would like to know "whether it is in place to tell these fellows [meaning the discharged men] they can come back" and the chairman's only reply was to inquire whether he had anything more to say respecting the charges. These two items of evidence permit of no other conclusion of fact than that at the time of the hearing Worzalla offered and was willing to take the men back. On this record the order for back pay, if there was to be any, and the amount of it was to be conditioned on the date of an offer to reinstate, should have been for such pay until September 1st, not until Worzalla should make an offer in the future.

Counsel for the board contends that the failure of the hearing chairman to answer Worzalla's inquiry whether he could offer to take the men back is excusable because after the court action was started efforts on behalf of the board to adjust differences were out of order. He even claims that such efforts were out of order at any time after the men were discharged. We consider this an improper conception of the duty and power of the board and its members and representatives. It is contrary to the practice of the board in the instant case. The activities of Fr. Haas of the board and of Mr. Brophy, the board's representative, were not begun until after the men were discharged and were continued after the court action was commenced. These efforts were entirely proper, and such efforts are conducive to satisfactory adjustments. A word from the hearing chairman to Worzalla when he made his inquiry at the close of the hearing that an offer to reinstate the men on the status existing when they were discharged would have been not only proper but welcomed by the board and would quite likely have prevented the confiscatory order made in the instant case. Conciliation is one of the functions of the board. Sec. 111.16, Stats.

Conciliations and conciliatory efforts are in order at any stage of the proceedings.

Defendant assigns as error that certain testimony, considerable in amount, was improperly received by the chairman. For illustration, one of the employees testified that Worzalla "did not exactly object to men joining the union, but was trying his best so we would step out." Other statements of like nature were made by other employees. What Worzalla did and what he said were of course receivable in evidence, but to allow the witnesses to say what Worzalla's object or purpose or intent was in doing or saying as he did or said, was improper. Hathaway was permitted to say, in effect, that Worzalla's conduct was such as to constitute coercion. Witnesses were permitted to testify that at one of the meetings one of Worzalla's sons said the company could afford to give a raise of five cents an hour and that the other said it could give a raise of ten cents. Neither of the sons was shown to know anything about the matter, and these statements, if made, were not admissions of or evidence against the company. Sec. 111.10 (2), Stats., provides that in proceedings before the board "the rules of evidence prevailing in courts of law or equity shall not be controlling." But this does not warrant the receipt as evidence of statements as to the effect of items of evidence or as to matters that are entirely without probative value. Hearsay may doubtless be received, if corroborative of other evidence or otherwise of such nature as to have some reasonable bearing on a fact for determination. Letters and documents from a party may be received without authentication such as is necessary in courts. But nonlegal evidence to be admissible must have some substantial probative force and not be a mere opinion except in fields where the opinion of experts is proper for consideration and the person giving it is shown to have some special knowledge reasonably entitling his opinion to some weight. There was so much evidence received in this case entirely wanting in any reasonable view in probative

force that a word of warning seems appropriate. This view is fully supported by the recent decision of the supreme court of the United States in *Consolidated Edison Co. v. National Labor Relations Board, supra,* wherein it is said, in respect of the provision in the statute above quoted, which is also in the federal act (p. 229):

"The obvious purpose of this and similar provisions is to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order. [Citing cases.] But this assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. Mere uncorroborated hearsay or rumor does not constitute substantial evidence."

It is further said in this opinion, page 229, of the language of the National Labor Relations Act, which is incorporated in the Wisconsin act, "the findings of the board as to the facts, if supported by evidence, shall be 'conclusive,' means supported by substantial evidence. . . . Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

The company claims that the circuit court committed error in refusing to require the board to certify up for consideration of the court a certain letter from Mr. Brophy and a proposed contract prepared and proposed by the company which counsel for the company had supposed was properly introduced in evidence. This contract, according to the affidavit of the company's counsel, contained provisions that by August 1, 1937, the company would reinstate all the proposed employees who applied for reinstatement, would give them a raise of five cents an hour and would recognize the local union as their bargaining agent. During the taking of testimony on the company's offering some telegrams from representatives of the board, the chairman stated: "If you

want to we can introduce the whole file" in evidence, to which counsel for the board consented, and by reason of this counsel for the company assumed that the proposed contract was in evidence. The letter and contract were among this file according to counsel's affidavit. If so, they were in evidence without anything being said about them. Subs. (5) and (6) of sec. 111.10, Stats., provide that the review in the circuit court is on the record "certified by the board." The file is the record of the board. It includes the evidence taken before the hearing chairman and all papers and documents considered by the board in arriving at its determination. Incidentally we are unable to find any certificate of the board to the record in this case. The evidence taken before the hearing chairman instead of being certified by the board as it should have been as part of its record is brought up by a bill of exceptions which is unnecessary in these proceedings. The documents above referred to were not included in the bill of exceptions. The defendant moved the court, in effect, to direct the board to certify them up for consideration of the court. The motion was denied on the ground that the evidence was "merely cumulative, and not material, and no reason shown why it should not have been produced before the board." The proposed contract was quite material and was not merely cumulative as it tended to show the defendant was willing to make an offer of a raise of wages. The motion was not made until after judgment had been entered by the court and motion for reargument had been denied. The motion might properly have been denied for that reason. However, the point is worthy of mention because of a provision of sec. 111.10, Stats., relating to procedure on review. Sub. (5) provides that if either party shall apply to the court to produce further evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence on the hearing before the

board, or hearing chairman, the court may order such evidence to be taken before the board and to be made a part of the record. Sub. (6) of sec. 111.10, Stats., provides that the practice in the action of the board shall prevail in the action brought by the employer. Under these provisions we consider that had the company made timely motion to the court for receipt of this contract before the court the court should have ordered taken such course as it deemed proper to have it made a part of the record.

The defendant filed with the circuit court a petition alleging conduct of the board that it claims denied the defendant due process and asked the court to vacate the order of the board as void for that reason. We shall assume, for present purposes, without deciding or intending to intimate, that the petition was timely filed and stated facts sufficient to require a judgment vacating the order upon proper proceedings brought for that purpose. The board moved the court to strike the petition from the files on the ground that the court had no jurisdiction in the proceedings before it to attack the order on the ground laid in the petition. The court did not directly rule upon the motion to strike, but permitted examination of the members of the board in support of the allegations of the petition. The board by motion to review contends that the court should not have permitted the examination of the members of the board or permitted the taking of any evidence in support thereof, but should have granted its motion to strike.

A judgment or order entered by an administrative board in a *quasi*-judicial proceeding wherein the board has denied a party to it due process is void and the aggrieved party is entitled to an appropriate proceeding (if he has been prejudiced by the denial) to have the judgment or order set aside. Due process requires as much as "full hearing," the requirements of which have been recently passed upon by the supreme court of the United States in the *Morgan Cases, Morgan v.*

*United States,* 298 U. S. 468, 56 Sup. Ct. 906, 80 L. Ed. 1288; 304 U. S. 1, 58 Sup. Ct. 773, 82 L. Ed. 1129, and in *Consolidated Edison Co. v. National Labor Relations Board, supra.* What is required for a sufficient hearing before the industrial commission has just been considered by this court in *State ex rel. Madison Airport Co. v. Wrabetz,* 231 Wis. 147, 285 N. W. 504, and in *Kaegi v. Industrial Comm., ante,* p. 16, 285 N. W. 845. What is said in these cases ought to furnish sufficient guidance to the board in the future as to the kind of hearing that should be afforded an employer, and it is needless to say that the board should follow that guidance. We are here only considering whether in the proceeding prescribed by the statute for review of the labor board's orders the matter of due process can be gone into. We consider that when lack of due process appears in the record certified to the court by the board it may be. When it does not so appear it may not be. The basis for considering the matter of the industrial commission's conduct in the cases above cited is that the statute providing for review of decisions of the commission makes as a ground of the action for review "that the board has acted in excess of its powers," as it manifestly has if it has denied due process. Here we have no such statute. The statutes providing for review of the labor board's decisions, subs. (5) and (6) of sec. 111.10, Stats., limits the jurisdiction of the court in the proceeding under the statute to "jurisdiction of the proceeding and of the *question determined therein.*" The "question determined therein" means the "question determined" by the board. The board does not determine any question of due process. It only determines whether the employer was guilty of unfair labor practices and if he was what affirmative action, if any, is required to effectuate the policies of the labor act. If the taking of evidence in addition to that certified up by the board is to be taken, it is to be taken not by the court, but by

the board or one of its agencies, pursuant to direction of the court. The "additional evidence" covered by the statute is evidence bearing upon the question determined by the board. The court makes its decision upon "the evidence in the record," that is, the evidence certified by the board upon which the board rendered its decision. In view of the limitations imposed by the statute upon the court in its review of the board's order we consider that the conduct of the board cannot be proved or considered in the instant proceeding. If a party wishes to attack an order of the board for want of due process because of any act of the board not appearing in the record certified by the board the only way open appears to be to proceed by an action in equity to set aside the action of the board. He may concurrently procure review on the merits by proceeding under sec. 111.10, Stats., in which case, or if the board is prosecuting an enforcement proceeding, his equity action must be brought in the same court. That two proceedings are required where one would answer the purpose may seem a cumbersome and overtechnical requirement, but it is required by the terms of the act which may not be avoided by the court. It follows that the court should have granted the board's motion to strike and refused to hear evidence in support of the petition.

*By the Court.*—The judgment of the circuit court affirming the action of the board is reversed, and the record is remanded with direction to the circuit court to direct modification of the order of the board as follows: Strike from the "cease and desist" portion of the order paragraph (a); modify paragraph (b) of said portion to read: "In any manner interfering with, restraining, or coercing its employees in the exercise of their right to engage in concerted action for the purpose of collective bargaining or other mutual aid or protection." Modify the "affirmative action" portion of the order by substituting in (a) thereof for "(1)," "(b) and

(c)," and striking therefrom the remainder of paragraph (a) after the word "above;" strike from such portion of the order paragraph (c).

The following opinion was filed June 30, 1939:

PER CURIAM (*on motion for rehearing*). Motions for rehearing have been made by the attorney general and by Mr. Feinsinger, attorney for the board when the case was argued and decided, and briefs have been filed by them and by attorneys for the Wisconsin State Federation of Labor as *amici curiæ*. Since the decision was rendered the legislature has abolished the board and repealed the act under which the board functioned. Ch. 57, Laws of 1939. The attorney for the plaintiff has moved to dismiss the motions on the ground that as the former defendant is no longer in existence it cannot move the court, and that as the board cannot itself move the court, neither can the attorney general or its former attorney move in its behalf. The question raised by the plaintiff's motion is interesting. But whether the board or the attorneys moving in its behalf have capacity or power so to move, the court has power of its own motion to determine whether the case was correctly decided, and to withdraw or modify its former opinion according as it shall determine if it considers that the decision was in any respect erroneous. The record is still before us. In the case of *State ex rel. Hemmy v. Miller,* 173 Wis. 412, 179 N. W. 815, 181 N. W. 745, neither party moved for a rehearing. The time for presenting such motion had expired. But the record was still in this court, and a federal question being involved, and the court's attention having been called by an attorney not connected with the case to a decision of the United States supreme court deciding the question contrary to the decision of this court, made prior to this court's decision, the court of its own motion ordered a rehearing, reconsidered the case and corrected its former ruling. A brief *amicus curiæ* was received. See also *State ex rel. Postel v. Marcus,* 160 Wis.

354, 152 N. W. 419. We shall therefore consider such matters as are presented in the briefs filed as we deem proper for consideration and of enough importance to require it.

The briefs filed in effect request that all the provisions of the repealed Wisconsin Labor Relations Act should be construed by the court to serve as a guide to the labor board that has been appointed under the Labor Relations Act enacted on the repeal of the former act. This we consider we cannot properly do as it would in effect be giving advice to the present board in respect to its handling of matters that may in the future come before it. Such questions as may come before that board must await our decision when in due course and properly they come before us.

The only question that we deem it necessary now to consider or of import enough to warrant our consideration at this time is the interpretation of our opinion relating to the point of affirmative action respecting back pay on reinstatement of the discharged employees. We held that the provision of the order of the board requiring pay to these employees until such time subsequent to the decision of the board as they should return to the plaintiff's employment pursuant to an offer by him to take them back, was made upon an erroneous view of the law by the board and reversed the order in that respect. We considered that the board was of the view that under the act the discharged employees were entitled to back pay as matter of right from the time of their discharge until their reinstatement. It is contended in the briefs filed that they were so entitled. It is contended that the board could order reinstatement or not, and order back pay or not, but if it ordered back pay at all it must order full back pay up to the time of reinstatement. To the latter we cannot agree. The language of the act as to affirmative relief is that the board may "take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies" of the Labor Relations Act.

(Sec. 111.10 (3), Stats. 1937.)   We held that this provision did not as matter of right entitle discharged employees to full back pay, less earnings of course, up to the time of their reinstatement, if reinstatement and back pay were ordered, but that the power of the board in fixing the amount of back pay was limited to such amount as it deemed was reasonably necessary to effectuate the purposes of the act.   The amount to be ordered, if it was ordered, was discretionary with the board, and the discretion of the board, if abused, or if exercised on an erroneous view of the law, was subject to review and correction by the court.   That is all we intended to hold, and we consider that, reasonably and fairly considered, that is all the opinion indicates we did hold respecting the matter of back pay.   To that view we adhere.

One of the briefs urges that the mandate of the court should have remanded the case to the board with directions to make another order relating to back pay.   If so, now to change the order in that respect would be futile, as the board is out of existence.   If we have occasion in the future to reverse orders of the new board respecting back pay we can then enter such mandate as we then deem proper.

No useful purpose would be served by considering other matters mentioned in the briefs.   We perceive nothing in our opinion necessary to withdraw, and no occasion, on our own motion or otherwise, to order a rehearing, and none will be ordered.