LIBBY, MCNEILL & LIBBY, Respondent, v. WISCONSIN EMPLOYMENT RELATIONS COMMISSION and another, Appellants.*

*No. 137. Argued September 8, 1970.—Decided October 9, 1970.*
(Also reported in 179 N. W. 2d 805.)

* Motion for rehearing denied, with costs, on January 5, 1971.

278

For the appellant Wisconsin Employment Relations Commission the cause was argued by *David J. Hanson,* assistant attorney general, with whom on the brief were *Robert W. Warren,* attorney general, and *William H. Wilker,* assistant attorney general.

For the complainant-appellant there was a brief by *Goldberg, Previant & Uelmen* and *David Loeffler,* all of Milwaukee, and oral argument by *Mr. Loeffler.*

For the petitioner-respondent there was a brief by *Melli, Smith & Shiels* of Madison, and oral argument by *Robert W. Smith.*

HANLEY, J. The following issues are presented on this appeal:

(1) Whether respondent's economically motivated decision to mechanize a portion of its operation so affects terms and conditions of employment that it is a mandatory subject of collective bargaining under secs. 111.02 (5), and 111.06 (1) (d), Stats.;

(2) Whether the respondent's failure to bargain the effects of the decision to mechanize constitutes a refusal to bargain under sec. 111.06 (1) (d), Stats.; and

(3) Whether the order of the WERC requiring the respondent to cease and desist from refusing to bargain collectively, to establish preferential hiring lists, and to bargain on request and reduce any agreement reached to writing was appropriate under the circumstances.

*Decision to mechanize as a mandatory subject of collective bargaining.*

Whether or not the decision to mechanize is a mandatory bargaining subject is clearly an issue of law.

There are standards which govern the scope of the court's review of an agency's conclusions of law. In

view of the importance and newness of the issue at bar, it is appropriate to reiterate the reviewing standards before considering the merits.

In *Milwaukee v. Wisconsin Employment Relations Comm.* (1969), 43 Wis. 2d. 596, 600, 601, 168 N. W. 2d 809, the topic was summarized as follows:

"In *Pabst v. Department of Taxation* (1963), 19 Wis. 2d 313, 120 N. W. 2d 77, 5 A. L. R. 3d 594, this court pointed out that there are two methods of reviewing an administrative agency's application of a statute to certain facts. The first method is the analytical approach whereby the court decides which part of the agency's determination presents a question of fact and which part a question of law. The second method is the practical or policy approach which avoids allocating labels of 'fact' or 'law' to the agency's determinations. When the practical approach is used, judicial review is exhausted if there is found to be a rational basis for the conclusions approved by the administrative body.

" 'We believe that pars. (b) and (d) of sec. 227.20 (1), Stats., require Wisconsin courts to employ the analytical approach when reviewing agency decisions. Nevertheless, in fields in which an agency has particular competence or expertise, the courts should not substitute their judgment for the agency's application of a particular statute to the found facts if a rational basis exists in law for the agency's interpretation and it does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions.' *Pabst v. Department of Taxation, supra,* at pages 323 and 324.

"There can be no doubt that the question presented in this case is one of 'law.' In decisions even more recent than the *Pabst Case,* this court has further discussed its obligation in reviewing an administrative agency's interpretation of questions of law.

" 'The supreme court is not bound by an administrative agency's construction of a statute. . . .' *National Amusement Co. v. Department of Revenue* (1969), 41 Wis. 2d 261, 274, 163 N. W. 2d 625. *See also: Johnson v. Chemical Supply Co.* (1968), 38 Wis. 2d 194, 156 N. W. 2d 455.

"However,

" '. . . the construction and interpretation of a statute adopted by the administrative agency charged with the duty of applying the law is entitled to great weight. . . .' *Cook v. Industrial Comm.* (1966), 31 Wis. 2d 232, 240, 142 N. W. 2d 827. *See also: National Amusement Co. v. Department of Revenue, supra; Chevrolet Division, General Motors Corporation v. Industrial Comm.* (1966), 31 Wis. 2d 481, 143 N. W. 2d 532.

"This court does not independently redetermine every conclusion of law made by an administrative agency.

" '. . . If several rules, or several applications of a rule are equally consistent with the purpose of the statute, the court will accept the agency's formulation and application of the standard.' *Milwaukee Transformer Co. v. Industrial Comm.* (1964), 22 Wis. 2d 502, 510, 126 N. W. 2d 6."

The WERC's conclusion that respondent was required to bargain about its decision before it made its decision cannot be sustained if respondent had no duty to bargain about its decision at any time.

In early Nineteenth century England a group of workingmen, known as the Luddites, attempted to prevent the use of mechanical labor-saving devices by destroying them. Since that time, as technology has marched unyieldingly forward, there have been numerous clashes over the idea of replacing men with machines. In view of this, it is quite remarkable that there appears to be no case on the point of issue disputed in the case at bar.

In deciding what should or should not be included in mandatory bargaining the court must weigh the relative value of two very significant but conflicting public policies. On the one hand, it is necessary to preserve the freedom of private enterprise to manage its business as it sees fit. At the same time though the court is bound to effectuate the purposes of the Employment Peace Act. The act declares that industrial peace, regular and adequate income for employees and uninterrupted production of goods and services are goals to be achieved in employment relations. Sec. 111.01 (2), Stats.

The WERC states that the issue is whether the decision affects terms and conditions of employment. We think that this is not an accurate statement. Any management decision may affect terms and conditions of employment. Not all management decisions are bargainable.

In *Fibreboard Corp. v. Labor Board* (1964), 379 U. S. 203, 85 Sup. Ct. 398, 13 L. Ed. 2d 233, a leading case in the field, the employer decided it could effect a cost savings by contracting out the maintenance work being performed by its own union employees. The court held, at page 209, that:

". . . *on the facts of this case,* the 'contracting out' of the work previously performed by members of an existing bargaining unit is a subject about which the National Labor Relations Act requires employers and the representatives of their employees to bargain collectively. . . ." (Emphasis supplied.)

The court pointedly limited its decision to the facts of the case.

Justices STEWART, DOUGLAS and HARLAN, concurring, further cautioned against a broad interpretation of *Fibreboard,* at page 223:

"In many of these areas the impact of a particular management decision upon job security may be extremely indirect and uncertain, and this alone may be sufficient reason to conclude that such decisions are not 'with respect to . . . conditions of employment.' Yet there are other areas where decisions by management may quite clearly imperil job security, or indeed terminate employment entirely. *An enterprise may decide to invest in labor-saving machinery. Another may resolve to liquidate its assets and go out of business. Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepreneurial control.* Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. If, as I think clear, the purpose of sec.

8 (d) is to describe a limited area subject to the duty of collective bargaining, those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area." (Emphasis supplied.)

We think the holding in the *Fibreboard Case* was not intended to make every management decision which affects employees bargainable.

Counsel for WERC contends that in all important respects the facts in *Fibreboard* are analogous to those in the case at bar. We do not agree. This contention ignores the change in basic operating procedure involving a change in capital investment. *See: NLRB v. Adams Dairy, Inc.* (8th Cir. 1965), 350 Fed. 2d 108, 111, certiorari denied (1966), 382 U. S. 1011, 86 Sup. Ct. 619, 15 L. Ed. 2d 526.

Shortly after the *Fibreboard* decision the United States Supreme Court decided the case of *Textile Workers v. Darlington Co.* (1965), 380 U. S. 263, 85 Sup. Ct. 994, 13 L. Ed. 2d 827, where the issue before the court was whether the total liquidation of the enterprise as an admitted reprisal for "going union" violated secs. 8 (a) (1) and 8 (a) (3) of the National Labor Relations Act. These sections refer to employer actions which restrained an employee's exercise of his right to engage in concerted activity and employer actions which discriminate against employees because of union membership. Neither of these sections are relevant to the case at bar. However, in the course of its decision, the United States Supreme Court indicated that an employer could close his entire business for any reason. But if he closed only a part of his business or moved it from one place to another and his reason for doing so was to "chill unionism" in the remaining plants or at the new location, that would be an unfair labor practice. The court did not discuss whether the employer was required to bargain

about a decision to partially terminate, motivated solely by economic reasons.

From *Fibreboard, supra,* we can conclude that most management decisions which change the direction of the corporate enterprise, involving a change in capital investment, are not bargainable.

This court expressed a similar view in *UAW Local 577 v. Hamilton Beach Mfg. Co.* (1968), 40 Wis. 2d 270, 283, 162 N. W. 2d 16. The court recognized that management rights still exist in Wisconsin as the general rule. The court stated:

". . . The location of a manufacturing plant is inherently a prerogative of the company."

In *NLRB v. Transmarine Navigation Corp.* (9th Cir. 1967), 380 Fed. 2d 933, 937, the court held that a decision to terminate a business and reinvest as part of a joint enterprise was a fundamental change "in the direction and operation of the corporate enterprise which greatly affected its capital, assets and personnel" and was not bargainable. The *Transmarine Navigation* court distinguished cases involving anti-union animus on the part of the employer; *e. g., NLRB v. Winn-Dixie Stores, Inc.* (5th Cir. 1966), 361 Fed. 2d 512, and *NLRB v. American Mfg. Co. of Texas* (5th Cir. 1965), 351 Fed. 2d 74. Citing *NLRB v. Northwestern Publishing Co.* (7th Cir. 1965), 343 Fed. 2d 521 and *NLRB v. William J. Burns International Detective Agency, Inc.* (8th Cir. 1965), 346 Fed. 2d 897, the *Transmarine Navigation* court held that decisions involving a managerial judgment lying at the core of entrepreneurial control, and in which the employer was not continuing the same work at the same plant under similar conditions of employment are not bargainable. The same court also relied on *NLRB v. Royal Plating & Polishing Co.* (3d Cir. 1965), 350 Fed. 2d 191, and *NLRB v. Rapid Bindery, Inc.* (2d Cir. 1961), 293 Fed. 2d 170.

None of these courts of appeals holds that the test is whether the change affects conditions of employment. Each change which was held to be nonbargainable did affect conditions of employment. The test is not that applied by the WERC, but is whether the decision was one which changed the basic direction of the company's activities.

Sec. 180.30, Stats., provides in part:

"The business and affairs of a corporation shall be managed by a board of directors. . . ."

Cases relied upon by the WERC for its conclusion that the mechanical harvesting decision is bargainable are: *Wittock Supply Co.* (1968), 171 NLRB No. 33; *Winn-Dixie Stores, Inc.* (1964), 147 NLRB 788, modified (5th Cir. 1966), 361 Fed. 2d 512, certiorari denied, 385 U. S. 935, 87 Sup. Ct. 295, 17 L. Ed. 2d 215; and *Dixie Ohio Express Co.* (1967), 167 NLRB 573. These cases are distinguishable. In the first two cases there was both evidence of anti-union attitude and the change merely substituted outsiders doing the same work in the same manner. In the *Dixie Ohio Case* the management decision was made to avoid inefficiencies which resulted from collectively bargained work rules. The board simply held that an employer cannot unilaterally change inefficiencies which resulted from a specific prior agreement with the union.

We conclude that the management decision in the instant case was not a mandatory subject of collective bargaining within the meaning of sec. 111.02 (5), Stats.

*Effects of decision as a mandatory subject*
*of collective bargaining.*

We now consider the question of whether the "effects" of the decision were bargainable.

The decision and its "effects" are distinct issues. Several cases have held that while a particular business decision may be so clearly within management's preroga-

tive as to be nonmandatory; nevertheless, the "effects" of that decision are within the scope of mandatory bargaining. In *Transmarine Navigation Corp.*, *supra*, the employer decided solely on economic grounds to terminate its business and reinvest its capital in a different enterprise in another location. The court of appeals held that the decision itself was not a subject of mandatory bargaining, but then went on to say, at page 939:

"This is not to hold that the employer is absolved of all duty to bargain with a union when he makes such a managerial decision. Once such a decision is made the employer is still under an obligation to notify the union of its decision so that the union may be given the opportunity to bargain over the rights of the employees whose employment status will be altered by the managerial decision. N. L. R. B. v. Rapid Bindery, Inc., 293 F. 2d 170 (2d Cir. 1961) ; N. L. R. B. v. Royal Plating and Polishing Co., 350 F. 2d 191 (3rd Cir. 1965) ; N. L. R. B. v. Winn-Dixie Stores, Inc., 361 F. 2d 512 (5th Cir. 1966). See N. L. R. B. v. Lewis, 246 F. 2d 886 (9th Cir. 1957). Such bargaining over the 'effects' of the decision on the displaced employees may cover such subjects as severance pay, vacation pay, seniority, and pensions, among others, which are necessarily of particular importance and relevance to the employees. *Royal Plating and Polishing Co.*, *supra*, 350 F. 2d at 196."

It is well established that where the employment relationship is threatened by a unilateral economic move by the employer, the federal courts and the National Labor Relations Board have found an enforceable duty to bargain over the impact of that decision on the employees. *NLRB v. Thompson Transport Co., Inc.* (10th Cir. 1969), 406 Fed. 2d 698, rehearing denied. *See also: Ozark Trailers, Inc.* (1966), 161 NLRB 561; *Wittock Supply Co.*, *supra; Morrison Cafeterias Consolidated, Inc.* (1969), 177 NLRB No. 113, 71 LRRM 1449 (plant closings) ; *Standard Handkerchief Co., Inc.* (1965), 151 NLRB 15; *McLoughlin Mfg. Corp.* (1967), 164 NLRB 140; *Cooper*

*Thermometer Co.* (1966), 160 NLRB 1902 (2d Cir. 1967), 376 Fed. 2d 684.

We conclude that "effects" of the decision were bargainable.

*The WERC remedial order.*

The final issue is whether or not WERC's remedial order was reasonable and appropriate under the circumstances.

Sec. 111.07 (4), Stats., provides in part that:

". . . Final orders may . . . require him [a person found guilty of an unfair labor practice] to take such affirmative action, including reinstatement of employes with or without pay, as the board may deem proper. . . ."

The reasonableness of the order must be viewed in the light of the finding by the WERC that respondent was guilty of an unfair labor practice in refusing to bargain.

The order of the WERC should be affirmed unless the respondent can show that the order has no tendency to effectuate the purposes of the Employment Peace Act. *Wisconsin Employment Relations Board v. Algoma Plywood & Veneer Co.* (1948), 252 Wis. 549, 32 N. W. 2d 417, affirmed, 336 U. S. 301, 69 Sup. Ct. 584, 93 L. Ed. 691.

The precise remedy chosen here, placement of the displaced employees on a preferential hire list and an order to bargain with the union with respect to other aspects of the displacement, has been sustained by courts of appeal. *Cooper Thermometer Co., supra; NLRB v. Rapid Bindery, Inc.* (2d Cir. 1961), 293 Fed. 2d 170. The labor board has consistently affirmed the preferential hire remedy in similar circumstances, a failure to negotiate an economically motivated decision to eliminate jobs. *Plymouth Industries, Inc.* (1969), 177 NLRB No. 71; *Royal Plating & Polishing Co., supra; Drapery Mfg.*

*Co.* (1968), 170 NLRB No. 199; and *McGregor Printing Corp.* (1967), 163 NLRB 938.

An attitude of deference by courts to administrative agencies is well established. This principle was most recently affirmed in *NLRB v. Drapery Mfg. Co.* (8th Cir. 1970), 425 Fed. 2d 1026, 1028, where the court stated:

> ". . . It is an established principle that a Board order 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' Virginia Electric & Power Co. v. NLRB, 319 U. S. 533, 540, 63 Sup. Ct. 1214, 1218, 87 L. Ed. 1568 (1943). The rationale for the rule is that the Board, as an administrative agency, 'must draw on enlightenment gained from experience' in fashioning its remedies, NLRB v. Seven-Up Co., 344 U. S. 344, 73 S. Ct. 287 (1953). . . ."

We think the WERC had authority to make the remedial order in this case. However, the order must be modified in accordance with this opinion. Such modification requires the deletion of paragraph 2 (a) [1] of the WERC order and a modification of paragraph 2 (b) (2),[2] so as to delete any reference to collective bargain-

---

[1] "2. It is further ordered that the respondent, Libby, McNeill & Libby, shall

"(a) Cease and desist from refusing to bargain collectively with the complainant, Obreros Unidos-United Workers, with respect to the decision to mechanize its 1968 cucumber harvesting operation and eliminating the jobs of the hand harvesting employes affected thereby."

[2] "(2) Upon request, bargain collectively with the complainant, Obreros Unidos-United Workers, with respect to its decision to mechanize its 1968 cucumber harvesting operation and the effects of such decision on hand harvesting employes, including preferential hiring procedures establishing the method and conditions by which qualified bargaining unit employees may, if they desire, obtain seasonal or regular employment when available, and embodying any understanding reached as a result of such collective bargaining in a signed memorandum agreement."

ing with respect to the respondent's decision to mechanize.

*By the Court.*—Judgment and order reversed, and cause remanded for entry of new judgment and order modified in accordance with this opinion.

WILKIE, J. (*dissenting in part*). I respectfully dissent from that part of the majority opinion which holds that the decision to replace the cucumber hand-picking operation with mechanical harvesters was not bargainable. I interpret *Fibreboard* [1] differently than the majority, as requiring bargaining of a decision, as here, which certainly and directly has an impact on job security without contemplating the complete termination of business.[2] The decision here was to discontinue the hand-picking work but to replace that operation with mechanized harvesting. The harvesting was continued; only the method was completely changed. The decision did not affect other parts of the cucumber processing work.

The WERC reached a conclusion of law in determining that the decision to mechanize the 1968 cucumber harvesting dealt with terms and conditions of employment of many seasonal workers. I think that this conclusion is a reasonable application of the statute and that this application should be accepted by this court. To bargain does not mean that the employer is surrendering his final right to make the mechanization decision. All that is required is that he give the union a chance to persuade the employer that, as the WERC noted in its opinion supporting its order, "[T]here are reasonable and economical alternatives to the contemplated change in operation."

I have been authorized to state that Mr. Justice HEFFERNAN joins in this dissenting opinion.

---

[1] *Fibreboard Corp. v. Labor Board* (1964), 379 U. S. 203, 85 Sup. Ct. 398, 13 L. Ed. 2d 233.

[2] *UAW Local 577 v. Hamilton Beach Mfg. Co.* (1968), 40 Wis. 2d 270, 162 N. W. 2d 16.

ROBERT W. HANSEN, J. (*dissenting in part*). The majority here holds that a management decision to replace its pickle picking employees with pickle picking machines did not relate to the "terms and conditions of employment of such employees," [1] and was, therefore, not bargainable, although the "effects" of such decision did and are. It relies on the *Fibreboard Case* [2] in so doing. *Fibreboard* held that a management decision to replace employees with those of an independent contractor to do the same work, did relate to "terms and conditions of employment" and was subject to the duty to bargain collectively. So the majority of our court makes a distinction between the replacement of a worker by another person and his replacement by a machine. The writer sees no basis for such distinction. In both cases the worker is out of his job, and a someone or something else has taken his place. The impact upon his wages, hours and working conditions is exactly the same in both situations. They are gone.

While the majority opinion in *Fibreboard* does not reach nor discuss what difference it would have made if the Fibreboard employees had been replaced by machines, instead of by employees of independent contractors, the writer does not see why the definition of "terms and conditions of employment" should vary according to the nature of the replacement. Whether the jobs are lost to men or machines should not change the recognition of the fact that the conditions and terms of employment are affected by the very fact of the replacement.

The majority here appears to take from the concurring, not the majority, opinion in *Fibreboard* the conclusion that "The test is . . . whether the decision was one which changed the basic direction of the company's ac-

[1] Sec. 111.02 (5), Stats.
[2] *Fibreboard Corp. v. Labor Board* (1964), 379 U. S. 203, 85 Sup. Ct. 398, 13 L. Ed. 2d 233.

tivities." If so, the meaning, as well as the emphasis, changed in the paraphrasing. The three concurring justices in *Fibreboard* stated it this way: ". . . those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area [of collective bargaining]." This writer would accept the "fundamental to the basic direction . . . or impinging only indirectly upon employment security" test as suggested in the *Fibreboard* concurring opinion in determining whether management decisions to replace present employees by either machines or other workers affect the terms and conditions of employment so as to be subject to collective bargaining.

