WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Respondent, v. CITY OF EVANSVILLE, Appellant: GENERAL DRIVERS, DAIRY EMPLOYEES AND HELPERS LOCAL UNION NO. 579, etc., Intervenor Respondent. [Case No. 209.]

CITY OF EVANSVILLE, Appellant, v. WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Respondent. [Case No. 210.]

CITY OF EVANSVILLE, Appellant, v. WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Respondent. [Case No. 211.]

*Nos. 209–211. Argued November 26, 1974.—Decided June 30, 1975.*
(Also reported in 230 N. W. 2d 688.)

For the appellant there were briefs by *Joseph A. Melli, Jack D. Walker, James K. Pease, Jr.* and *Melli, Shiels,*

*Walker & Pease, S. C.*, all of Madison, and oral argument by *Jack D. Walker*.

For the respondent the cause was argued by *Charles D. Hoornstra*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

For the intervenor-respondent there was a brief by *John S. Williamson, Jr., Thomas J. Kennedy*, and *Goldberg, Previant & Uelmen*, all of Milwaukee, and oral argument by *Mr. Williamson*.

HEFFERNAN, J. In this case, the General Drivers, Dairy Employees and Helpers Local 579, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, engaged in the organization of certain employees of the city of Evansville. Pursuant to a petition of the union, an election was ordered. Following an election conducted by the Wisconsin Employment Relations Commission, the union filed a complaint alleging that the city had committed prohibited practices prior to the election. The election was set aside, and the WERC affirmed its examiner's order directing the city to recognize the union as the exclusive representative for the employees in the affected departments.

Following the WERC proceedings, the WERC petitioned the circuit court for Rock county for an enforcement order. The circuit court entered judgments confirming and enforcing the WERC orders to recognize the union, dismissing the city's petition for review of the recognition order, and dismissing the petition of the city for a review of the order setting aside the election results. The city of Evansville has appealed from all these judgments.

Three issues are dispositive of this appeal: (1) Whether there was sufficient evidence to support the findings of the WERC that the city had committed pro-

hibited practices; (2) whether the WERC had the authority to order the city to recognize the union as the employees' exclusive representative in the absence of a union election victory; and (3) assuming that the findings of the commission were supported by the evidence and it was within the power of the commission to issue an order for recognition, whether such order was appropriate in this case.

The facts in all of these cases are substantially undisputed, although the inferences to be drawn from those facts are disputed. The record shows that on October 16, 1969, the union communicated with the mayor and city clerk, informing them that the union had been authorized by a majority of the employees to represent them for the purposes of collective bargaining. On October 20, 1969, the union petitioned the WERC for an election to determine that the union represented the employees of the city's Water Department, the Street and Alley Department (Department of Public Works), and Police Department Dispatchers. At the time this petition was filed, union authorization cards had been signed by all but one of the employees in those departments and all but two of the employees had paid the union initiation fee. On November 21, 1969, the WERC ordered that an election be held in those three departments of the city to determine whether the employees desired representation by the union and whether the employees wanted to have that group constitute a separate unit for collective bargaining purposes.

The election was conducted on December 9, 1969. The employees of the Street and Alley Department and the employees of the Water and Light Department voted for separate bargaining units, while the nonuniformed members of the Police Department voted against a separate unit.

The only representation vote counted was that of the Water and Light Department, where the employees re-

jected union representation by a vote of three to two. The ballots on the representation question which were cast by employees of the Department of Public Works and the Police Department were impounded.

On December 12, 1969, the union filed objections to the conduct of the city and its officers, claiming that they had committed prohibited practices during the pre-election period. The union alleged that the city, on two occasions while the election was pending, offered benefits to employees, stating that they would secure those benefits without the necessity of having a union, and also alleged that the city threatened the loss of benefits in the event that the employees' vote supported the union. It also argues that some employees did not understand the ballots.

A specific complaint was filed on January 6, 1970, alleging violations of sec. 111.70 (3) (a) 1 and 2, Stats. 1969,[1] in that employees were threatened with the deprivation of fringe benefits if they voted for the union and promised additional benefits if they voted against the union.

The examiner for the commission conducted a hearing and found that, by threatening loss of benefits if the union were supported, by promising future benefits if the union were opposed, by interrogating an employee about his union affiliation, and by threatening to subcontract work and eliminate jobs if the employees supported the union, the city interfered with, restrained, and coerced its employees in the exercise of their rights to

---

[1] "111.70 **Municipal employment.**

"(3) PROHIBITED PRACTICES. (a) Municipal employers, their officers and agents are prohibited from:

"1. Interfering with, restraining or coercing any municipal employe in the exercise of the rights provided in sub. (2).

"2. Encouraging or discouraging membership in any labor organization, employe agency, committee, association or representation plan by discrimination in regard to hiring, tenure or other terms or conditions of employment."

engage in concerted activity in behalf of the union. The examiner ordered the city to cease and desist from the prohibited practices and ordered it to recognize the union as the exclusive representative for the employees of the three departments.

The city's petition for review was dismissed; and, on March 15, 1971, the WERC issued an order adopting the examiner's findings, conclusions, and orders.

On April 6, 1971, the WERC alleged that the city had failed to comply with its order and that it did not intend to do so. It, accordingly, petitioned the circuit court for Rock county, under the provisions of sec. 111.07 (7), Stats. 1969, to confirm and enforce the commission's order of March 15, 1971.

The union intervened in these proceedings in support of the WERC's petition for enforcement and also asked for an order directing the city to bargain in good faith.

The city petitioned for the review of the WERC's March 15, 1971, order and asked for the dismissal of the union's complaint of prohibited practices.

Additionally, the WERC, in a proceeding of its own, on July 14, 1971, ordered the results of the December 9, 1969, election set aside and ordered the petition for the election dismissed. On August 13, 1971, the city petitioned the circuit court for a review of the commission's order setting aside the election and asked that that order be vacated and that the election results be certified.

On November 3, 1972, the circuit judge entered judgment confirming and enforcing the WERC's order of March 15, 1971, and dismissed the city's petition for review. On the same day, judgment was entered dismissing the city's petition for a review of the commission's order setting aside the election results.

Another set of judgments identical in nature to those entered on November 3, 1972, was entered on January 16, 1973.

The city has appealed from both sets of judgments.

On this appeal the city contends that it committed no prohibited practices. This raises the question of whether the evidence of record is sufficient to support the findings of the commission that the acts of the city constituted practices prohibited by the statutes. The quantum of evidence sufficient to support the findings and conclusions of the commission in this proceeding, a circuit court action for an enforcement order, is set forth in sec. 111.07 (7), Stats. 1969. That standard of review is that: "The findings of fact made by the commission, if supported by credible and competent evidence in the record, shall be conclusive."

We are not unmindful of the provision of sec. 111.07 (8), Stats. 1969, which provides that, "The order of the commission shall also be subject to review in the manner provided in ch. 227 . . . ." In general, a circuit court under ch. 227 is held to the review standard stated in sec. 227.20 (1) (d), which provides that an administrative finding may be modified if "Unsupported by substantial evidence in view of the entire record as submitted." That standard of review is not applicable in the instant case, for sec. 111.07 (7) specifically applies when a proceeding is brought in circuit court for the enforcement of a WERC order. We point out, however, that in the instant case the standard of review selected would not control the outcome of this court's decision. Under either standard, the evidence is sufficient to support the commission's findings.

The standard of review, however, which we think appropriate appears in *St. Francis Hospital v. Wisconsin Employment Relations Board* (1959), 8 Wis. 2d 308, 311, 98 N. W. 2d 909, wherein we said, quoting an earlier case:

" 'The findings of fact made by the board, if supported by credible and competent evidence, are conclusive. Sec.

111.07 (7), Stats. The extent of the review by the courts is the same as that under the Workmen's Compensation Act, that is, there must be some evidence tending to support the finding of the board, and, if this is discovered, the court may not weigh the evidence to ascertain whether it preponderates in favor of the finding. . . . The drawing of inferences from the facts is a function of the board and not of the courts. . . .' "

The WERC based its findings and conclusions that the city had indulged in prohibited practices of a threatening and coercive nature on the basis of three incidents. The first was a letter signed by the mayor and the aldermen which was sent to each employee and was published .in the Evansville newspaper on November 27, 1969. The most significant paragraph of that letter stated:

"We wonder if the city employees are cognizant of the fact that if they voted to accept the union, all fringe benefits now being paid by the city, would cease and the only pay they would receive, would be their base pay. Any fringe benefits gained there-after, would have to be bargained for. If a union were to be accepted, it is conceivable that many new problems and hardships would be created not only on the city, but on the employees as well. Some examples might be the installation of time clocks, regulated coffee breaks, and the possible loss of certain freedoms that the employees now enjoy. In essence, a demarcation line would be drawn, with the salary or white-collar workers and supervisors on one side and the hourly employees on the other."

The examiner found that statement threatened a loss of benefits and was a violation of sec. 111.70 (3) (a) 1, Stats. 1969, *supra,* footnote 1.

On the other hand, the city referred to the second and twelfth paragraphs of the same letter as evidence that it had no intent to interfere with the employees' right to organize.

Paragraph 2 stated:

"The City can not prevent their employees from petitioning for union representation, and it is not our intent to do so, nor is it our intent to degrade unions."

Paragraph 12 stated:

"Lastly, there shall be no animosity shown or reprimand given to any employee who has taken an active part in trying to procure Union services."

The examiner's memorandum concluded that the specific threat of loss of benefits and other privileges encompassed in the fifth paragraph outweighed the "pious platitudes" and "benign generalities" that appeared in paragraphs 2 and 12.

The Wisconsin Employment Relations Commission, in its review of the examiner's findings, concluded that the statement appearing in paragraph 5 of the letter was coercive and unlawful, both in the context of the letter itself and in the context of other activities of the municipal employer.

On appeal to this court, the city acknowledges that the references in paragraph 5 to a more regimented employment relationship under the union, and particularly the statement that all benefits would cease if union representation was accepted, while incorrect, were merely innocent misstatements of the law and that the letter was intended to be informative and not coercive.

The city also argues that the union had ample opportunity prior to the election to correct any misstatements which appeared in the letter published on November 27, 1969.

While there are instances when an innocent misstatement of fact may be harmless or the union may have the burden of correcting a misstatement, the situation here does not constitute an instance of that kind. A misrepresentation, though innocent, may be sufficient to cause an election to be set aside. *Hollywood Ceramics Co., Inc.,*

*and United Brick and Clay Workers of America, AFL–CIO* (1962), 140 NLRB 221. The *Hollywood Ceramics Case* also stated that a misrepresentation could be the basis for setting aside an election if it were made so shortly before the election that the other party does not have an opportunity for reply. The city, therefore, argues that the *Hollywood Ceramics Case* stands for the proposition that the union could have corrected the city's misstatement and its failure to do so was a waiver of the misrepresentation.

While the *Hollywood Ceramics Case* stands for the proposition that the injured party may have a duty to correct a harm that is caused by a misstatement alone, the misstatement here was not merely a misstatement of fact but was coupled with phraseology which the examiner and the WERC could correctly conclude constituted a threat. Here, the WERC specifically concluded that the city's unlawful and coercive statements were not waived as mere factual misstatements even though the union might have attempted to counter them with a correct statement of the facts and law prior to the election.

The fifth paragraph of the letter was more than a misstatement. It was a threat that "if they voted to accept the union, all fringe benefits now being paid by the city, would cease."

The city has cited a number of cases in which misstatements were found to be noncoercive. However, the effect of a misstatement is to be subjectively determined on a case-to-case basis. In *NLRB v. Gissel Packing Co.* (1969), 395 U. S. 575, 619, 89 Sup. Ct. 1918, 23 L. Ed. 2d 547, Mr. Chief Justice WARREN, speaking for the court, said that it was the national board's duty to focus on the question: " '[W]hat did the speaker intend and the listener understand?' (A. Cox, Law and the National Labor Policy 44 (1960) )." The United States Supreme Court stated that the coercive impact of statements was

initially a question to be decided by the administrative board and that, in review, the court must recognize "the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *Gissel, supra,* page 620.

In *Dal-Tex Optical Co., Inc., and International Union of Electrical, Radio and Machine Workers, AFL–CIO* (1962), 137 NLRB 1782, the National Labor Relations Board considered employer statements within the context of the employer-employee milieu existing at the time of the utterances. It pointed out that an employer's statements must be considered in the light of the particular case and that comments which merely appeared to be statements of fact or misstatements could assume a threatening and coercive nature.

The WERC, contrary to the city's argument, considered that the references in the letter to the installation of time clocks and the loss of job freedom were more than predictions. In addition, they were threats. Even a prediction may be coercive if it is intended as a threat. *Gissel, supra,* page 618.

Our court in the *St. Francis Case, supra,* page 311, pointed out that it is the duty of the courts to give deference to the inferences drawn from facts relied upon by the Wisconsin Employment Relations Commission. As both the holdings of this court and of the United States Supreme Court indicate, it is the function of the administrative board to judge the impact of statements and to determine whether or not they are coercive. The inference drawn was not unreasonable on the basis of the facts.

We conclude that the evidence was sufficient to support the findings and conclusion of the WERC that the statement embraced in paragraph 5 of the November 27, 1969, letter constituted a threat. We also agree with the WERC and its examiner that the "benign generalities"

which the city has cited to show that it had no animosity toward the union were insufficient to overcome the specific threats of paragraph 5.

As the National Labor Relations Board stated in *Anchor Coupling Co., Inc., and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL–CIO* (1967), 168 NLRB 218, 219, footnote 2, "We do not believe that this general declaration was sufficient to neutralize the effect of the supervisors' coercive conduct."

The WERC properly concluded, on the basis of sufficient evidence, that the letter threatened employees with the loss of benefits if they engaged in union activity. As a consequence, this conduct constituted a prohibited practice in violation of sec. 111.70 (3) (a) 1, Stats. 1969.

The commission concluded that a second letter, sent to employees shortly before the election, also constituted a prohibited practice. In that letter from the mayor and common council appeared the following statements:

"Your Mayor and Council are definitely interested in resolving the impasse which appears to have arisen, regarding wage negotiations this year (due to misunderstanding of the offer already made) without the necessity of a union being brought in. The cost to you of Union Membership would be $94.00 for the year 1970 alone, and is no guarantee that the offer already made could or would be improved. We are taking this opportunity to again advise you of the actual wage rates, both with and without the fringe benefits, you already have.

" . . .

". . . We feel that with unionization action our City Departments could and would lose much of the freedom of action which they now have.

"In summation we feel that our employees should reconsider their position and by talking with their aldermanic committees, completely resolve this situation without the expense to them of having an outsider involved."

The WERC concluded that by this letter the city "continued its campaign of threats of dire consequences that

might result if the Union were successful in organizing its employees . . . ."

On appeal, the city argues that these were merely factual statements relating to the employees—that certain expenses were involved in becoming union members and the union in fact could not guarantee that its selection as a representative of the employees would secure improvements in the conditions of employment. While it would not be unreasonable to follow the reasoning of the city in that respect, an employer cannot be allowed to guise threats on the ground that they are predictions.

As pointed out above, the WERC had the duty of determining the intent with which the statements were made by the city. It had the duty of determining the meaning which the employees would reasonably place upon those statements. The WERC in its competence determined that the statements, in their context, were intended as threats, and were accepted as threats by the employees. There was sufficient evidence to show that the threats made in the second letter—threats of loss of benefits if the union were supported and promises of benefits if the union were defeated—constituted prohibited practices under sec. 111.70 (3) (a) 1, Stats. 1969.

The WERC also concluded that a coercive conversation took place between an employee of the Water and Light Department and his supervisor sometime near the end of November in 1969. The employee testified:

"Well, he asked me if I belonged to the Union and I asked him if it made any difference and he said 'You might just as well tell me because if you don't I'll find out anyway.' So, I said 'I do. I belong to the Union.' "

This conversation took place in the presence of two other employees. The WERC concluded that this conversation was not only threatening to the particular employee but was probably threatening to his fellow workers. The city contends, however, that the supervisor

in question had no history of an antiunion animus, that the incident was an isolated one, and no reprisals were threatened or taken against the employee. The National Labor Relations Board, upon whose authority the WERC relied in the instant case, has, however, concluded in *Struksnes Construction Co., Inc., and International Union of Operating Engineers, Local No. 49, AFL–CIO* (1967), 165 NLRB 1062, 1063, that the polling of employees in respect to union membership would be considered a restraint upon the employees' right to organize and would be considered coercive unless the following safeguards were observed:

"(1) the purpose of the poll is to determine the truth of a union's claim of majority, (2) this purpose is communicated to the employees, (3) assurances against reprisal are given, (4) the employees are polled by secret ballot, and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere."

We agree with the WERC's conclusion that the city met none of the criteria of *Struksnes*. Under that rationale, the conversation with an employee of the Water and Light Department in the presence of other employees constituted a violation of sec. 111.70 (3) (a) 1, Stats. 1969. There is sufficient evidence to support that finding.

In addition, during the last week of November, 1969, the director of the Department of Public Works called a meeting of his department's employees. One of the employees testified that the director said:

". . . if the Union got in, why, that really didn't necessarily give us any job protection. He said that if the City wanted to, they could contract the garbage out and they could contract the snowplowing out and, therefore, these jobs could be eliminated."

The Director of Public Works admitted that he had talked to the employees and stated he did not think the

union would be beneficial to them. He denied, however, any statement that the jobs would be eliminated by subcontracting garbage pickups or snow-removal work. The WERC resolved this conflict of testimony in favor of the employee and concluded, on the basis of the evidence:

". . . that the threat of subcontracting unit work was just one more example of Respondent's attempt to undermine the Union's majority status."

It is argued that this was merely an isolated statement and that the city indeed had the right to subcontract work. The WERC concluded that this statement constituted a threat during the pendency of the election and was another example of the city's interference with the rights of the employees who were engaged in concerted lawful union activities. We believe that the WERC could properly draw the inference:

"While the Municipal Employer might have a legal right to subcontract certain of its municipal functions, the threat to do so under the circumstances herein, was found by the Examiner to be unlawful and we agree. The statements made by the representative of the Municipal Employer do not fall within the protection of the exercise of free speech and we agree with the Examiner that the threats of reprisals interfered with the right of the employes to engage in concerted activity."

The WERC's finding is supported by the evidence; and, in the context of the case and in the exercise of its expertise, it could properly conclude that the statement was threatening and was a violation of sec. 111.70 (3) (a) 1, Stats. 1969.

In view of these findings of prohibited conduct, the examiner ordered, and the WERC affirmed, an order directing the city to recognize the union, even though no election results were tabulated that showed a union victory.

The union relies upon a delegation of powers given to the WERC in sec. 111.70 (4) (a), Stats. 1969:

"(4) POWERS OF THE COMMISSION. The commission shall be governed by the following provisions relating to bargaining in municipal employment:

"(a) *Prevention of prohibited practices.* Section 111.07 shall govern procedure in all cases involving prohibited practices under this subchapter."

Sec. 111.07 (4), Stats. 1969, provides in part:

"Final orders may dismiss the charges or require the person complained of to cease and desist from the unfair labor practices found to have been committed, suspend his rights, immunities, privileges or remedies granted or afforded by this subchapter for not more than one year, and require him to take such affirmative action, including reinstatement of employes with or without pay, as the commission deems proper."

The city on this appeal would emphasize that portion of sec. 111.70 (4) (a), Stats. 1969, which states that "Section 111.07 shall govern *procedure.*" (Emphasis supplied.) We find this interpretation contrary to the manifest intent of the statute. If only the procedural aspects of sec. 111.07 were applicable, it is apparent that the WERC would have no substantive power to impose sanctions with respect to the prohibited practices set forth in sec. 111.70 (4) (a).

It is apparent from the statute itself that the legislature intended that the WERC have substantial power to effectuate the purposes of the municipal labor statutes by resort to sec. 111.07. This court in *Board of Education v. WERC* (1971), 52 Wis. 2d 625, 635, 191 N. W. 2d 242, held that sec. 111.07 (4), Stats., was incorporated by reference in sec. 111.70 for substantive remedial purposes. That case is dispositive of the WERC's substantive power to invoke provisions of sec. 111.07 (4) to effectuate the purposes set forth in the municipal labor law in respect to prohibited practices.

The question remains, however, whether the language of sec. 111.07 (4), Stats. 1969, authorizes the commission

to direct the city to recognize the union. Such power is given to the WERC under the language of that statute which provides, in respect to an offending party, that the WERC "require him to take such affirmative action . . . as the commission deems proper."

*Folding Furniture Works v. Wisconsin Labor Relations Board* (1939), 232 Wis. 170, 181, 285 N. W. 851, 286 N. W. 875, said, "affirmative action" was limited "to what is considered by the board reasonably necessary to 'effectuate the policies' of the act."

More recently, that portion of sec. 111.07 (4), Stats. 1969, was interpreted in *Libby, McNeill & Libby v. WERC* (1970), 48 Wis. 2d 272, 286, 179 N. W. 2d 805, wherein we stated an order of the WERC "should be affirmed unless the respondent can show that the order has no tendency to effectuate the purposes of the Employment Peace Act."

While the reference in *Libby* is to the purposes of the Employment Peace Act, which appear in sec. 111.01, Stats., those purposes are identical with the policy purpose of sec. 111.70 (2), the Municipal Employment statute, wherein it is declared that municipal employees shall have the right to affiliate with labor organizations "of their own choosing" and the right to be represented by labor organizations "of their own choice."

The order, which directs the municipal employer to recognize the union, under the circumstances here effectuates the policy of the municipal employment statutes.

In the instant case, the recognition order gave effect to the wishes expressed almost unanimously prior to the campaign of threats and coercion undertaken by the municipal employer. The order here effectuated the employees' freedom of choice, which became impossible in the climate created by the employer—a climate that the WERC found tainted any possible election results. The effectuation of this fundamental policy of labor law was

discussed in *Gissel, supra,* in which the United States Supreme Court recognized the necessity of recognition orders to assure the implementation of the employees' freedom of choice. It further pointed out the appropriateness of such affirmative action. The court said:

"If the Board could enter only a cease-and-desist order and direct an election or a rerun, it would in effect be rewarding the employer and allowing him 'to profit from [his] own wrongful refusal to bargain,' *Franks Bros., supra,* at 704, while at the same time severely curtailing the employees' right freely to determine whether they desire a representative. The employer could continue to delay or disrupt the election processes and put off indefinitely his obligation to bargain; and any election held under these circumstances would not be likely to demonstrate the employees' true, undistorted desires." (Brackets in *Gissel*) (Pp. 610, 611)

The court added:

"If an employer has succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election, he may see no need to violate a cease-and-desist order by further unlawful activity. The damage will have been done, and perhaps the only fair way to effectuate employee rights is to re-establish the conditions as they existed before the employer's unlawful campaign. There is, after all, nothing permanent in a bargaining order, and if, after the effects of the employer's acts have worn off, the employees clearly desire to disavow the union, they can do so by filing a representation petition." (Pp. 612, 613)

The latter paragraph well states the manner in which a recognition order effectuates the purpose of the labor law, and its rationale is applicable to the fundamental public policy of sec. 111.70, Stats. 1969. It also points out the appropriateness of a recognition order, rather than the mere issuance of a cease-and-desist order, which can in no way re-establish the conditions which existed prior to the employer's contamination of the election atmosphere.

It should be pointed out additionally that the recognition order utilized by the WERC is particularly appropriate to preserve municipal employees' freedom of choice. If the Wisconsin Employment Relations Commission did not have the power to order union recognition under circumstances such as those in the instant case, employees of municipalities, who under sec. 111.70 (4) (l), Stats. 1969, do not have the right to strike, would be defenseless and without any meaningful remedy against an employer who followed a course of threats and coercion. As *Gissel* points out, the issuance of a cease-and-desist order would be insufficient to recoup the employees' freedom of choice. Rather, it would, as the consequence of an employer's own prior misconduct, make it possible for him to avoid union recognition.

In the instant case, of course, the status quo which the union recognition order seeks to maintain is that existing prior to the election, when all but one member of the employee group wished to be represented by the union. The city indeed correctly points out the infirmities of conferring union recognition on the basis of authorization cards that have been circulated by union organizers prior to the submission of the petition for an election. We do not conclude that authorization cards are foolproof. They probably are not, and in some instances the method of securing the cards may be coercive. Nevertheless, a test of the validity of those authorization cards has been effectively interdicted by the employer, who now contends they should not be considered evidence of employee choice. This problem, too, was considered by the United States Supreme Court in *Gissel*, wherein it said that the superiority of determining the will of the employees through the election process does not render authorization cards useless in all circumstances, because "where an employer engages in conduct disruptive of the election process, cards may be the most effective—perhaps the only—way of assuring employee choice." (P. 602)

Although, as we have concluded, the affirmative action taken by the commission in ordering union recognition is of the type contemplated by sec. 111.07 (4), Stats. 1969, the city argues on this appeal that another section of the statutes, 111.70 (4) (d), provides for the election process "to determine whether they desire to be represented by a labor organization."

The city argues that this is the exclusive method by which the WERC can exercise any authority to recognize a union and that, had the WERC the power to recognize a union on the basis of authorization cards alone, the legislature would have specifically granted that option.

There is no doubt that sec. 111.70 (4) (d), Stats. 1969, confers the right upon the municipality to have the representation question determined by an election. However, we have pointed out above that sec. 111.07 (4), which we held to be applicable to prohibited practices within the municipal labor field, provides that the rights, immunities, privileges, or remedies of an offending party may be suspended for not more than one year; and affirmative action, including the recognition of the union, may be required.

While the case relied upon by the city, *Sales & Service Union, Local 1348 v. Gimbel Brothers Department Store* (1942), WERC Dec. No. 366, is undoubtedly correct in that the commission does not have the power to certify bargaining representatives on the basis of authorization cards alone, the situation there was concerned with an original petition and did not involve the rectification of harm done by an employer's commission of prohibited practices, which the commission here concluded would vitiate the better normal practice, a free and open election.

The union recognition in the instant case arises out of the powers conferred on the WERC to remedy the

employer's commission of prohibited practices. The WERC does not have that authority as a matter of original determination to recognize a union on the basis of cards alone. While an election held under laboratory conditions is most likely to result in a vote that represents the free and uncoerced choice of the employees, when an employer has destroyed the opportunity for such free choice, a recognition order, in the commission's discretion, may be the only method available to reasonably achieve the goal of determining or implementing the employees' choice.

Nor are we persuaded by the city's reliance on sec. 111.70 (3) (a) 3, Stats. 1969. It argues that, under that section, it is only a prohibited practice to refuse to bargain with a representative certified after an election has been held. It argues, therefore, that, whether the union has been recognized or not, it cannot be the bargaining representative. This, of course, is a problem that has not yet arisen; but it is apparent that, in any event, the recognition given to the union in this case has in fact resulted from a situation created by the employer that prevented certification by election under the terms of sec. 111.70 (4) (d). Carried to an absurdity, an employer could avoid effective unionization by committing prohibited practices that would preclude fair elections. It would appear that the remedial action which the WERC was authorized to undertake by a recognition order effectuates the purposes of the act and obviates the absurd situation which the city raises as a future dilemma.

The city also points to a revision of the statute which came in 1971. Prior to the laws of that year, there was no specific duty imposed upon a municipal employer to bargain with the representative of a majority of its employees. That duty was imposed by sec. 111.70 (3) (a) 4, Stats. 1971. That statute also provides that:

"An employer shall not be deemed to have refused to bargain until an election has been held and the results thereof certified to the employer by the commission."

We conclude, on the basis of the rationale stated above, that by the procedure adopted here, the WERC has exercised its powers authorized by statute to certify a union under circumstances where a fair election could not be held. The legal effect of the recognition order is the equivalent of the certification of the union following an election. Under sec. 111.70 (3) (a) 4 of the statutes of 1971, the recognition order, by operation of law, has become a bargaining order.

Although we have, in conjunction with the legality of the order, also discussed reasons why the recognition order is an appropriate remedy, the city argues that there was no evidence or indication that the violations could not be completely and effectively remedied by a less extreme form of relief. It argues that a recognition order is never appropriate unless the employer has destroyed all possibility of a free and secret election. That position has been rejected by the supreme court in *Gissel*, where it said the use of a bargaining order may be appropriate if the practices indulged in "nonetheless still have the tendency to undermine majority strength and impede the election processes" (p. 614), even though it cannot be said that there is no possibility of a valid election.

This lesser showing, *Gissel* emphasized, is particularly appropriate when there is evidence that at a time prior to the commission of the prohibited practices the union had a clear majority.

Additionally, the city argues that the WERC has the subjective duty of analyzing the particular violations and has the duty of explaining why a recognition order is appropriate in the instant case. The city correctly cites several United States Court of Appeals cases which have

refused to enforce NLRB bargaining orders in the absence of a board analysis of the factual situation demonstrating subjectively why the order was warranted.

In *NLRB v. General Stencils, Inc.* (2d Cir. 1971), 438 Fed. 2d 894, the court explained the reason it was requiring a detailed explication of the need for, and appropriateness of, the bargaining order in the particular instance. It emphasized that the detailed analysis was necessary because of the possibility of a reversal on the underlying facts of unfair labor practices.

In the instant case, the examiner painstakingly discussed the effect of each prohibited practice and its relationship to the bargaining order. Those findings and conclusions of the examiner were expressly approved by the commission, and hence the policy of *General Stencil* was satisfied.

The analysis of the examiner complied with requirements of *Gissel,* wherein the court stated, at pages 614 and 615, that a recognition order should issue:

"If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order . . . ."

After discussing the facts, the examiner stated:

"Viewed in this light, the Examiner finds that the possibility of eradicating the effects of past prohibited practices through the possible direction of a Commission directed election, although present, is at best marginal and that the overwhelming employe sentiment as expressed through the Union authorization cards could better be protected by ordering Respondent to recognize Complainant Union."

In its separate conclusions, after referring to the findings of the examiner, the WERC stated:

"To require the employes to cast a ballot to determine their bargaining representative after the unlawful acts committed by the Municipal Employer, would permit the Municipal Employer to take advantage of its own unlawful activities."

In the instant case, although it would have been preferable for the commission itself to have given additional detailed explanation of the appropriateness of the remedy in respect to each violation, our review of the record shows that each act of the city constituted a prohibited practice that undermined the possibility of a fair election.

A remand to the WERC could result in only a superfluous reanalysis of prohibited practices that clearly impaired the possibility of a reasonably free and fair election.

The examiner's conclusion, as incorporated in the WERC's order, that a new election would only marginally have the opportunity to protect the rights of the majority, is sufficient, when considered with the acts of the employer, to justify the appropriateness of the order.

The city persistently argues that the acts of the employer were not of a nature to warrant the drastic remedy of a recognition order. In *Libby, McNeill & Libby v. WERC* (1970), 48 Wis. 2d 272, 287, 179 N. W. 2d 805, this court stated:

" '. . . It is an established principle that a Board order "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." ' "

It is the obligation of the court to defer to the commission in its selection of a remedial order. Where, as in this case, it cannot be said that the recognition order is a patent attempt to achieve ends other than those contemplated by the Municipal Employment Relations Act, and it is otherwise within the legal authority of the

commission, and the findings upon which it is based are supported by sufficient evidence, it will not be set aside by this court.

In the course of oral argument, the question of the duration of the effectiveness of the recognition order was raised. It is our understanding that the effective date of that order was stayed. This action was commenced in the circuit court by a petition for an enforcement order pursuant to sec. 111.07 (7), Stats. 1969. Sec. 111.07 (10) provides that the commencement of such proceedings operates as a stay of the commission's order. Therefore, we conclude that the recognition order has been stayed from that date and during the pendency of this appeal. It becomes effective upon the date of the mandate of this case.

We also conclude that, under sec. 111.07 (4), Stats. 1969, the right of an employer to assert that he has a good-faith doubt that the union represents a majority of the employees and the right to call for an election may be suspended by the WERC for a period not to exceed one year from the effective date of the recognition order.

As a subsidiary question, the city has appealed from the circuit court's judgment dismissing the city's petition to review the WERC's order setting aside the election. We conclude, in agreement with the trial judge, that the city was not a party aggrieved by that order. The effect of the order setting aside the election results and dismissing the union's petition for the election was that the employees were left without representation whether or not that election, if tallied, would have shown a union victory. This was exactly the result that the city wanted. In itself the order, therefore, gave the result desired by the municipality, and it was not aggrieved by that order. Even if we were to assume that the union lost the election, the setting aside of that election does not leave the city as a party aggrieved, because the city remains in the

same position as it did prior to the election—its employees were not represented. The city was clearly aggrieved by the other orders issued by the WERC, and the disposition of those orders and the judgments subsequently entered by the circuit court dispose of the substance of the grievances asserted by the city.

We accordingly conclude that there is sufficient evidence to support the WERC's findings and conclusions that the acts of the city constituted prohibited practices. We conclude that, under the statutes, the WERC has the authority to order recognition of the union as the employees' exclusive representative and that the invocation of that authority was appropriate under the circumstances. The city was not a party aggrieved in respect to the order setting aside the election results and dismissing the union's petition for election.

The circuit court's judgments correctly affirmed the orders of the Wisconsin Employment Relations Commission.

*By the Court.*—Judgments affirmed.