# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP2214 |
| COMPLETE TITLE: | Madison Teachers, Inc.,<br>　　　　Plaintiff-Respondent,<br>　　　v.<br>James R. Scott, Chairman and Records Custodian,<br>Wisconsin Employment Relations Commission,<br>　　　　Defendant-Appellant. |

ON BYPASS FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | February 6, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 5, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| 　COURT: | Circuit |
| 　COUNTY: | Dane |
| 　JUDGE: | Peter Anderson |

| | |
|---|---|
| JUSTICES: | |
| 　CONCURRED: | |
| 　DISSENTED: | A.W. BRADLEY, J. dissents, joined by ABRAHAMSON, J. (opinion filed). |
| 　NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant, there were briefs (in the court of appeals) filed by *Steven C. Kilpatrick*, assistant attorney general, and *Brad D. Schimel*, attorney general. There was an oral argument by *Steven C. Kilpatrick.*

For the plaintiff-respondent, there was a brief (in the court of appeals) filed by *Susan M. Crawford* and *Pines Bach LLP*, Madison. There was an oral argument by *Susan M. Crawford*.

An amicus curiae brief was filed on behalf of the Wisconsin Freedom of Information Council, the Wisconsin Newspaper Association, and the Wisconsin Broadcasters Association by

*Dustin B. Brown*, *James A. Friedman*, and *Godfrey & Kahn, S.C.*, Madison.

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2016AP2214
(L.C. No. 2015CV3062)

STATE OF WISCONSIN          :          IN SUPREME COURT

**Madison Teachers, Inc.,**

        **Plaintiff-Respondent,**

        **v.**

**James R. Scott, Chairman and Records Custodian, Wisconsin Employment Relations Commission,**

        **Defendant-Appellant**

**FILED**

**FEB 6, 2018**

Diane M. Fremgen
Acting Clerk of Supreme
Court

APPEAL from an order of the Circuit Court for Dane County. *Reversed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. This case comes before us on a bypass petition filed by the records custodian and chairman of the Wisconsin Employment Relations Commission ("WERC"), James R. Scott. Scott appeals a decision of the circuit court[1] that granted summary judgment to Madison Teachers, Inc. ("MTI") on its claim that the public records law was violated.[2] The circuit court also awarded MTI statutory damages, attorneys fees and costs.

---

[1] The Honorable Peter C. Anderson of Dane County presided.

[2] See Wis. Stat. § 19.37(1)(a) (2015-16). All further

(continued)

¶2 MTI had made repeated requests, at various times during the 2015 certification elections, for names of Madison Metropolitan School District (the "School District") employees who had voted as of those dates. WERC denied MTI's requests based on Scott's determination that while this election was ongoing, the public interest that elections remain free from voter intimidation and coercion outweighed the public interest in favor of openness of public records.

¶3 One issue is presented in this appeal: whether the public interest that elections remain free from voter intimidation and coercion in this certification election is sufficient to outweigh the public interest in favor of openness of public records. Because we conclude that Scott lawfully performed the balancing test in concluding that the public interest in elections free from voter intimidation and coercion outweighs the public interest in favor of openness of public records, we reverse the circuit court. Accordingly, no attorneys fees are due MTI under the provisions of Wis. Stat. § 19.37(2).

I. BACKGROUND

¶4 From November 4 through November 24, 2015, WERC conducted the annual certification election for collective bargaining representatives of the School District's employees

references to Wisconsin statutes are to the 2015-16 version unless otherwise noted.

2

pursuant to Wis. Stat. § 111.70(4)(d)3.b.[3] WERC contracted with the American Arbitration Association (the "Association") to provide technological services necessary to conduct the election.[4] With the Association's support, voting occurred via telephone and internet for 20 days, and the Association electronically maintained data for votes that were cast. According to the contract between WERC and the Association, the

---

[3] Wisconsin Stat. § 111.70(4)(d)3.b. states:

Annually, the commission shall conduct an election to certify the representative of the collective bargaining unit that contains a general municipal employee. The election shall occur no later than December 1 for a collective bargaining unit containing school district employees and no later than May 1 for a collective bargaining unit containing general municipal employees who are not school district employees. The commission shall certify any representative that receives at least 51 percent of the votes of all of the general municipal employees in the collective bargaining unit. If no representative receives at least 51 percent of the votes of all of the general municipal employees in the collective bargaining unit, at the expiration of the collective bargaining agreement, the commission shall decertify the current representative and the general municipal employees shall be nonrepresented. Notwithstanding sub. (2), if a representative is decertified under this subd. 3.b., the affected general municipal employees may not be included in a substantially similar collective bargaining unit for 12 months from the date of decertification. The commission shall assess and collect a certification fee for each election conducted under this subd. 3.b. Fees collected under this subd. 3.b. shall be credited to the appropriation account under s. 20.425(1)(i).

[4] In total, there were 301 union certification elections in November 2015, involving nearly 60,000 municipal employees.

Association was required to email election results to WERC no later than one business day after the election concluded.

¶5 Notably, under Wis. Stat. § 111.70(4)(d)3.b., in order to be certified as the elected representative of the bargaining unit, a labor organization must receive the votes of at least 51 percent of the total number of employees in the bargaining unit. Therefore, a non-vote in the election is for all intents and purposes a "no" vote. Pursuant to § 111.70(1)(e), certification elections are conducted by secret ballot.

¶6 One week prior to the start of the certification election, MTI wrote to Scott stating that it intended to submit requests pursuant to Wis. Stat. § 19.35(1) for records of the names of the School District's employees who had voted at specific points during the election. MTI wrote that it "wish[ed] to assure you that MTI will not engage in voter coercion or any other illegal election practices during the upcoming election. MTI is fully committed to exercising its First Amendment and statutory rights within the law."

¶7 On November 10, 2015, MTI submitted the first of its requests, seeking names of employees, by bargaining unit, who had voted as of that date. MTI requested that the records be delivered "as soon as possible, but not later than 5:00 p.m., November 16." On November 16, 2015, Scott advised MTI in writing that its request was denied for three reasons: first, because WERC utilized the Association, a third-party vendor to collect votes, the Commission did not possess the requested

4

documents; second, because the annual certification election is conducted by secret ballot, disclosure of the names of employees who had voted would violate the secrecy of the ballot; and third, because the common law balancing test weighed in favor of "maintaining the secrecy of the ballot and of avoiding the potential for voter coercion while balloting is ongoing . . . ." Scott was aware of a complaint submitted to WERC by the Racine Unified School District, alleging that voters had been coerced and harassed into voting during the 2014 annual certification elections.[5]

¶8 MTI submitted a second request on November 17, 2015, for names of employees, by bargaining unit, who had voted as of that date. MTI requested that Scott respond "as soon as possible, but not later than 5:00 p.m., November 20." This request was also denied in writing on November 30, 2015.

¶9 The election ended at noon on November 24, 2015. At 3:26 p.m. on that day, MTI submitted a third request to WERC, requesting names of all employees who had voted in the certification election. WERC provided those names, by bargaining unit, at 12:37 p.m. the following day, November 25.

---

[5] An affidavit subsequently filed in this action revealed that Scott was aware that the Racine Unified School District had filed a complaint alleging union representatives had approached three teachers, asked if they had voted in the certification election, and urged them to vote immediately in the representative's presence using the representative's laptop. The complaint was dismissed without investigation because the conduct, even if substantiated, would not have affected the outcome of the election.

Scott concluded that the public interest in maintaining openness of public records was satisfied by disclosing the requested lists immediately after the elections were over.

¶10  On November 30, 2015, MTI filed a complaint pursuant to Wis. Stat. § 19.37(1)(a),[6] seeking an order for mandamus, punitive damages, attorneys fees and costs, based on Scott's refusal to release voting records in response to MTI's November 10 and November 17 requests.  On December 1, 2015, MTI filed an ex parte motion, citing Wis. Stat. § 801.02(5), for an order shortening the time for filing an answer or other responsive pleadings from 45 days to 20 days.  The circuit court granted the ex parte motion on December 3.[7]  On December 4, 2015, MTI served the complaint, its ex parte motion and the resulting order on Scott.

---

[6] Wisconsin Stat. § 19.37(1)(a) states:

Enforcement and penalties.   (1) Mandamus.   If an authority withholds a record or a part of a record or delays granting access to a record or part of a record after a written request for disclosure is made, the requester may pursue either, or both, of the alternatives under pars. (a) and (b).

    (a) The requester may bring an action for mandamus asking a court to order release of the record.  The court may permit the parties or their attorneys to have access to the requested record under restrictions or protective orders as the court deems appropriate.

[7] The Honorable Juan B. Colas of Dane County presided. Scott filed a judicial substitution request on December 8, 2015, and on December 11, 2015, the Honorable Peter C. Anderson was appointed.

6

¶11 On December 11, 2015, Scott filed a motion and supporting brief to reconsider and vacate the court's December 3 order. A hearing was conducted on December 15, at which the court granted Scott 45 days to answer. Scott timely answered.

¶12 On December 22, 2015, WERC's legal counsel, Peter Davis, emailed the Association, stating: "Whenever convenient can you tell me if it [is] still possible to identify who had voted as of noon Nov 10 and noon Nov 17 in the various Madison Schools/Madison Teachers units. If it is possible, can you send me that info[] unit by unit[?]" The Association provided those records to WERC, which WERC provided to MTI during discovery.

¶13 MTI and Scott filed cross-motions for summary judgment. Scott argued, among other things, that the public interest in non-disclosure of the names of those who had voted when the election was ongoing outweighed the public interest in disclosure at that time and therefore, MTI did not have a legal right to the records it sought. Meanwhile, MTI argued that Scott failed to overcome the strong presumption in favor of openness of public records. Upon completion of briefing, the court granted MTI's motion and denied Scott's.

¶14 At the hearing on summary judgment, MTI also sought punitive damages, costs, and attorneys fees. A second hearing was held on these issues, and the court modified its previous order denying punitive damages and granting MTI $100.00 statutory damages, $41,462.50 attorney fees and $301.35 costs.

7

¶15 Scott appealed and, following initial briefing, Scott petitioned for bypass, which we granted. We now reverse the circuit court.

## II. DISCUSSION

### A. Standard of Review

¶16 We review a record custodian's decision to deny a public records request independently. It is the duty of the records custodian to specify the reasons for not disclosing a public record, and we decide whether those reasons outweigh the public interest in disclosure as a matter of law. See Democratic Party of Wis. v. DOJ, 2016 WI 100, ¶9, 372 Wis. 2d 460, 888 N.W.2d 584. When a records custodian employs a balancing test, it is the custodian's burden to show that the public interest favoring denial of the requested record outweighs the public interest favoring disclosure. Id. (citing John K. MacIver Inst. for Pub. Policy, Inc. v. Erpenbach, 2014 WI App 49, ¶14, 354 Wis. 2d 61, 848 N.W.2d 862).

### B. Public Records Law

¶17 Wisconsin's public records law is set forth in Wis. Stat. § 19.31, et seq. Wisconsin's public records law requires that, absent a statutory, common law or overriding public interest in denying access, the public has the right "to inspect certain documents within the possession of a state entity." Voces De La Frontera v. Clarke, 2017 WI 16, ¶17, 373 Wis. 2d 348, 891 N.W.2d 803. The public records law "serves one of the basic tenets of our democratic system by providing an

opportunity for public oversight of the workings of government." Nichols v. Bennett, 199 Wis. 2d 268, 273, 544 N.W.2d 428 (1996) (citing Newspapers, Inc. v. Breier, 89 Wis. 2d 417, 433-34, 279 N.W.2d 179 (1979)). When evaluating a public records request, we keep in mind that Wisconsin has a "presumption of open access to public records." Osborn v. Bd. of Regents of Univ. of Wis. Sys., 2002 WI 83, ¶13, 254 Wis. 2d 266, 647 N.W.2d 158 (citing Hathaway v. Green Bay Sch. Dist., 116 Wis. 2d 388, 397, 342 N.W.2d 682 (1984)); see also Wis. Stat. § 19.31 (providing that "it is . . . the public policy of this state that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of those officers and employees who represent them."); cf. Leann Holcomb & James Isaac, Comment, Wisconsin's Public Records Law: Preserving the Presumption of Complete Public Access in the Age of Electronic Records, 2008 Wis. L. Rev. 3, 515.

¶18 The public's right to access public records is very strong, but it is not unrestricted. Voces De La Frontera, 373 Wis. 2d 348, ¶18. "The strong presumption of public access may give way to statutory or specified common law exceptions, or if there is an overriding public interest in keeping the public record confidential." Kroeplin v. DNR, 2006 WI App 227, ¶13, 297 Wis. 2d 254, 725 N.W.2d 286 (citation omitted); see also Hathaway, 116 Wis. 2d at 397 ("[T]he general presumption of our law is that public records shall be open to the public unless there is a clear statutory exception, unless there exists a

9

limitation under the common law, or unless there is an overriding public interest in keeping the public record confidential.").[8]  In other words, "[b]ecause the denial of public access is generally contrary to the public interest," access may be denied only in limited circumstances. Kroeplin, 297 Wis. 2d 254, ¶12 (citing Kailin v. Rainwater, 226 Wis. 2d 134, 142, 593 N.W.2d 865 (Ct. App. 1999)).

¶19  In determining whether there is an overriding public interest in keeping a requested record confidential when there is no statutory exception to provision of the record, the record custodian balances competing public interests that bear on the release of the requested record. Milwaukee Journal Sentinel v. DOA, 2009 WI 79, ¶¶55-56, 319 Wis. 2d 439, 768 N.W.2d 700.  That is, the custodian balances the public interest in nondisclosure against the public interest in disclosure. Id., ¶55.  The balance is accomplished through a case-by-case analysis. Because the interests asserted in denying disclosure are discrete to each case, "blanket exceptions from release" generally are not forthcoming. Id., ¶56.  Stated otherwise, "the custodian must determine whether the surrounding factual circumstances create an 'exceptional case' not governed by the

---

[8] The legislature has codified some of the public records that are subject to public inspection and some that are statutorily exempt.  To that end, Wis. Stat. § 19.36 lists thirteen statutory exemptions, none of which are applicable here.

strong presumption of openness." Hempel v. City of Baraboo, 2005 WI 120, ¶63, 284 Wis. 2d 162, 699 N.W.2d 551.

¶20 The public interest balancing test considers "whether disclosure would cause public harm to the degree that the presumption of openness [of public records] is overcome." Democratic Party of Wis., 372 Wis. 2d 460, ¶11; see also Osborn, 254 Wis. 2d 266, ¶15.

### C. Secret Ballot Elections

#### 1. General principles

¶21 As a general matter, voting may occur by voice acclamation, the raising of hands in a meeting or by secret ballot, depending on the statutory directive or lack thereof. In regard to the matter before us, Wis. Stat. § 111.70(1)(e) requires that certification elections be conducted by secret ballot.

¶22 All 50 states have employed the secret ballot method of voting to limit voter intimidation during elections. Burson v. Freeman, 504 U.S. 191, 206 (1992). As explained in Burson, the history of election regulation in the United States shows that voter intimidation and coercion are long-standing evils that election regulations sought to prevent. Id.

¶23 The right to vote in certification elections is a statutory right; yet, Burson is instructive in the matter before us because of its exposition of the policies that underlie the use of secret ballots. In Burson, a political party worker sought to enjoin enforcement of Tennessee statutes that

11

prohibited solicitation of votes and display of campaign materials within 100 feet of entrances to polling places on election day. Id. at 193-94. The party worker claimed that the statutory regulation violated her right to communicate with voters, in contravention of her First Amendment rights. Id. at 194-95. Tennessee contended that its statutes were narrowly drawn to serve compelling state interests of preventing voter harassment and intimidation. Id. Further, Tennessee contended that the campaign-free zone "protects the right to vote in an election conducted with integrity and reliability." Id. at 199.

¶24 In concluding that the Tennessee statute was constitutional, even though it was not a content-neutral regulation of speech, the Supreme Court reviewed the history of the secret ballot method of voting in the United States and how it has had an immediate and positive effect in limiting intimidation and coercion of voters. Id. at 202-06. The Court concluded by explaining that the contest over Tennessee's election regulation involved "the exercise of free speech rights [in] conflict[] with another fundamental right, the right to cast a ballot in an election free from the taint of intimidation and fraud." Id. at 211. On balance, the Court said that removing the opportunity for intimidation of voters must prevail. Id.

2. Certification elections

¶25 2011 Wisconsin Act 10 made various changes to collective bargaining for most public employees. Act 10

12

requires annual certification elections, which are administered by WERC. Wis. Stat. § 111.70(1)(c) and (e). Prior to Act 10, collective bargaining units for municipal employees also were established through WERC's recognition of employee votes. See Madison Teachers, Inc. v. Walker, 2014 WI 99, ¶19, 358 Wis. 2d 1, 851 N.W.2d 337. Before Act 10, members of a collective bargaining unit were allowed to select a labor organization as their representative when a majority of the votes cast were for a particular labor organization, even when those votes were not equivalent to a majority of the employees in the bargaining unit. Id., ¶62. The elected union remained the representative unless 30 percent of members of the collective bargaining unit asked for a decertification election at which the union was defeated. Id.

¶26 Act 10 changed much of that. It required a labor organization that was representing a municipal bargaining unit to succeed in annual certification elections in order to continue. Id., ¶63. WERC was to certify any representative that received at least 51 percent of the votes of all of the employees in the collective bargaining unit. Id. Accordingly, a non-vote constituted a "no" vote. If no labor organization received 51 percent of the votes of all members of the bargaining unit, WERC was to decertify the current representative when the then-existing collective bargaining agreement ended and the members of the collective bargaining unit became unrepresented. Wis. Stat. § 111.70(4)(d)3.b.

¶27 Act 10 specifically prohibited employees from coercing or intimidating other employees in regard to joining, or refraining from joining, a labor organization. Wis. Stat. § 111.70(3)(a)1. Having certification elections that are free of intimidation and coercion was not a new goal for labor organization elections in Wisconsin. See WERC v. City of Evansville, 69 Wis. 2d 140, 164, 230 N.W.2d 688 (1975).

¶28 In City of Evansville, the process then required to hold a certification election had been followed and an election date was established. Id. at 146. Prior to the election, the City's agents coerced employees by offering benefits to those who did not support a union and threatened the loss of benefits to those who voted to support the union. Id. at 147. We held the City's actions were prohibited practices within the meaning of Wis. Stat. § 111.70(3)(a)1. Id. at 156.

¶29 Under current law, one of the primary goals of certification elections is to give employees an unintimidated voice in deciding who, if anyone, will be their representative. Wis. Stat. § 111.70(3)(a)1. Consistent with that goal, certification elections are conducted by secret ballot to lessen intimidation of voters. § 111.70(1)(e); see also Burson, 504 U.S. at 211.

¶30 Mechanisms to lessen voter intimidation when an election is carried out electronically over 20 days cannot be the same as they were in Burson when paper ballots were used at designated polling places. For example, the 100 foot restricted

14

zone around the polling place that the Supreme Court approved in Burson as a narrowly tailored restriction to meet the compelling state interest of reducing voter intimidation would have no effect in the election at issue here because members of the bargaining unit could vote from the workplace, from home or from another location over a 20-day period. However, preventing voter intimidation and coercion are as important in a statutory certification election as they were in an election of the type reported in Burson.

## D. Application

¶31 As evidenced above, we are tasked with independently weighing two important public interests. On the one hand, there is a general presumption that public records shall be open to the public unless there is a clear statutory exception, a limitation under the common law, or unless there is an overriding public interest in keeping the public record confidential. Hathaway, 116 Wis. 2d at 397. On the other hand, there is a clearly expressed right to vote in certification elections that are free from voter intimidation and coercion. Wis. Stat. § 111.70(3)(a)1.; see also Burson, 504 U.S. at 211.

¶32 MTI contends that because voting was ongoing, those who had not yet voted could not be treated as a firm "no" vote and, therefore, the lists of those who had voted would not violate the secrecy of the ballot by revealing the votes of anyone. MTI's argument misses the point of why disclosure of

the names of those who had voted affects the important public interest that underlies the use of secret ballots.

¶33 Let us explain. Throughout the election, MTI remained free to provide truthful information to all members of the bargaining unit that bore on the advisability of electing MTI as the exclusive representative. However, giving MTI lists of employees who had voted at various dates before the election process was concluded, through simple deletion of voter names from the list of all members of a bargaining unit, also would give MTI names of all who had not voted by those dates. Those non-voting employees could then become individual targets of MTI's most forceful efforts because if they did not vote by the conclusion of the election, MTI may have been unable to secure "yes" votes from 51 percent of the members in the bargaining unit and thereby fail in its certification efforts.

¶34 When elections are conducted over a period of time and voting occurs in many locations, there is no physical boundary by which voter intimidation can be regulated as there was in Burson. Therefore, preventing voter intimidation during elections conducted by phone and email, as occurred here, is challenging. Given MTI's repeated requests for the names of those who voted before the election concluded, it is entirely possible that those employees who had not yet voted would become subject to individualized pressure by MTI of a type that MTI could not exert when speaking to all members of the bargaining unit collectively.

16

¶35 As the history underlying the use of secret ballots teaches, a major purpose of secret ballots is to protect "the fundamental right" to cast votes in elections that are "free from the taint of intimidation." Burson, 504 U.S. at 211. While Burson did not involve a statutory right to vote in certification elections as is presented here, the public interest in certification elections that are free from intimidation and coercion is evidenced by the requirement that those elections be conducted by secret ballot and free from prohibited practices. Wis. Stat. §§ 111.70(1)(e) and 111.70(3)(a)1.

¶36 Intimidation in the WERC certification election was a concern. Scott had received detailed and specific complaints of past coercion in other certification elections.[9] Complaints included: a union representative directing an employee to a computer and coercing her to vote for recertification; another employee being repeatedly asked whether she had voted; and a third employee witnessing employees being similarly pressured to vote.

¶37 Each individual voter has a fundamental right to cast his or her vote without intimidation or coercion. WERC is charged with conducting fair and accurate annual certification elections, free from the taint of voter intimidation. The public has a significant interest in fair elections, where votes

---

[9] The Racine Unified School District had filed a complaint of which Scott was aware. See supra, ¶7.

17

are freely cast without voter intimidation or coercion. Accordingly, the public interest in elections that are free from intimidation and coercion outweighs the public interest in favor of open public records under the circumstances presented in the case before us. Scott's denial of MTI's requests for voter names during the course of the certification election evidences the lawful balance of public interests presented here.

## III. CONCLUSION

¶38 One issue is presented in this appeal: whether the public interest that elections remain free from voter intimidation in this certification election is sufficient to outweigh the public interest in favor of openness of public records. Because we conclude that Scott lawfully performed the balancing test in concluding that the public interest in elections free from voter intimidation and coercion outweighs the public interest in favor of openness of public records, we reverse the circuit court. Accordingly, no attorneys fees are due MTI under the provisions of Wis. Stat. § 19.37(1)(a).

*By the Court.*—The order of the circuit court is reversed.

¶39 ANN WALSH BRADLEY, J.  *(dissenting).*  The majority pays lip service to the important policy behind the public records law.  It proclaims that "[t]he public records law 'serves one of the basic tenets of our democratic system by providing an opportunity for public oversight of the workings of government'".  Majority op., ¶17.  Heralding the policy that "all persons are entitled to the greatest possible information regarding the affairs of government," it reaffirms that Wisconsin has a "presumption of open access to public records." Id.

¶40 Such exaltation seems to be all hat and no cattle. Despite Wisconsin's longstanding public policy favoring transparency, for the third time in three years this court continues to undermine our public records law.[1]  Yet again, this court overturns a lower court decision favoring transparency of records to which the public is rightfully entitled.  Once more we must ask, "[w]hat has the majority achieved with its opinion grounded in speculative, abstract, and unsubstantiated fears?" Democratic Party of Wis. v. DOJ, 2016 WI 100, ¶123, 372 Wis. 2d 460, 888 N.W.2d 584 (Abrahamson, J., dissenting).

¶41 This time the majority undermines the presumption of open access to public records by imputing an unsupported and

---

[1] See Voces De La Frontera, Inc. v. Clarke, 2017 WI 16, 373 Wis. 2d 348, 891 N.W.2d 803 (4-2 decision, Ann Walsh Bradley, J., dissenting, joined by Abrahamson, J.); Democratic Party of Wis. v. DOJ, 2016 WI 100, 372 Wis. 2d 460, 888 N.W.2d 584 (5-2 decision, Abrahamson, J., dissenting, joined by Ann Walsh Bradley, J.).

1

nefarious purpose to the records requests based on nonexistent facts. Without supportive evidence in the record, it speculates that by providing the requested records to Madison Teachers, Inc. (MTI), employees who had not yet voted in the recertification election "could then become individual targets of MTI's most forceful efforts." Majority op., ¶33.

¶42 Neither the majority nor the records custodian points to any evidence of voter intimidation or coercion by MTI in this recertification election. Rather, this concocted concern is based solely on one uninvestigated and unsubstantiated complaint from Racine County, involving a different union, in a different election, in a different year, that did not involve a public records request.

¶43 Not only does the majority base its conclusion on facts that do not exist, it also fails to inform the reader of existing facts in the record and existing public records precedent that support a contrary conclusion. See John K. MacIver Inst. for Pub. Policy, Inc. v. Erpenbach, 2014 WI App 49, ¶¶23, 26, 354 Wis. 2d 61, 848 N.W.2d 862 (explaining that a possibility of threats, harassment or reprisals cannot be accorded significant weight in the balancing test when the custodian fails to establish it is reasonably probable such harm would occur).[2] Nevertheless, the majority relies on conjecture

---

[2] See also Milwaukee Journal Sentinel v. DOA, 2009 WI 79, ¶¶57, 63, 319 Wis. 2d 439, 768 N.W.2d 700 (concluding that safety concerns about retaliation or harassment of DOC employees by incarcerated persons are not unique concerns and therefore do not preclude the disclosure of names of corrections employees).

2

about generalized concerns of voter coercion in denying this records request.

¶44 Unlike the majority, I conclude that the records custodian Scott failed to overcome the presumption of open access to public records. The unfounded speculation that the records might be used for improper purposes does not outweigh the strong public interest in opening the records to inspection.

¶45 Accordingly, I respectfully dissent.

I

¶46 The majority engages in selective vision. It sees facts that do not exist, while at the same time failing to recognize existing facts of record.

A

¶47 Left with non-existent facts, the majority instead speculates. It imputes an unsupported and nefarious purpose to the records requests. Ultimately it concludes that "[g]iven MTI's repeated requests[3] for the names of those who voted before the election concluded, it is entirely <u>possible</u> that those employees who had not yet voted would become subject to individualized pressure by MTI of a type that MTI could not exert when speaking to all members of the bargaining unit collectively." Majority op., ¶34 (emphasis added).

---

[3] When left without supportive facts, the majority apparently resorts to exaggeration. It states that MTI made "repeated requests" during the 2015 certification elections for the names of those who had cast ballots. Majority op., ¶¶2, 34. In fact, MTI made just two public records requests during the 2015 recertification election.

¶48 Absent from the record is evidence that providing the requested records presented a reasonable probability of voter intimidation or coercion:

- There is no evidence in the record that the Wisconsin Employment Relations Commission (WERC) opened an investigation about MTI engaging in such acts here.

- The record is devoid of any evidence of a verbal or written complaint of voter intimidation or coercion in this recertification election.

- The majority cannot point to any allegation in the record that MTI has ever acted improperly in this or any other recertification election.

¶49 Left with this void, the majority instead relies on an unsubstantiated allegation from Racine County that voters there "had been coerced and harassed into voting." Majority op., ¶7. The Racine allegations, however, involved not only a different location, but also a different union, in a different election, in a different year, that did not involve a public records request. WERC did not investigate the Racine allegations, and accordingly those allegations were never substantiated.

¶50 In short, it is difficult to imagine a scenario where there is less evidence of potential harm in the record than here. One would expect the highest court of this state to rely on more than such unrelated and unsubstantiated allegations for its assertion that the risk of voter intimidation or coercion here was great enough to overcome the strong presumption of open access to public records. It does not.

4

B

¶51 A public record that is available to one, is available to all. Kraemer Bros., Inc. v. Dane Cty., 229 Wis. 2d 86, 102, 599 N.W.2d 75 (Ct. App. 1999). It has long been recognized that "[n]either the identity of the requester nor the reasons underlying the request are factors that enter into the balanc[ing test]." State ex rel. Ledford v. Turcotte, 195 Wis. 2d 244, 252, 536 N.W.2d 130 (Ct. App. 1995); Levin v. Bd. of Regents of Univ. of Wis. Sys., 2003 WI App 181, ¶¶14-18, 266 Wis. 2d 481, 668 N.W.2d 779.

¶52 These guiding principles are rooted in the language of the statutes. Wisconsin Stat. § 19.35(1)(i) explains that a records custodian may not refuse to release a public record "because the person making the request is unwilling to be identified or to state the purpose of the request." Likewise, § 19.35(1)(a) provides that "any requester has a right to inspect any record." See also Linda de la Mora, The Wisconsin Public Records Law, 67 Marq. Law Rev. 65, 69 (1983) (explaining that in Wisconsin, as in most jurisdictions, the motive of the requester is irrelevant to the question of whether to grant access to public records).

¶53 The identity of the requester and the purpose of the request should not matter here. Nevertheless, if the majority is going to erroneously superimpose its own speculative motive upon the requester, it should at least mention existing facts of record that support a contrary conclusion. It fails to do so.

5

¶54 In providing context, counsel for MTI explained at oral argument that "the only opportunity that the public has for oversight of the WERC's election administration is through public records. There is a strong public interest in ensuring that the recertification elections that are conducted by the WERC are transparent and open to ensure the integrity of those elections."

¶55 The annual elections for public employees to select representatives for purposes of collective bargaining were previously conducted in person. They are now conducted electronically and employees vote either by phone or computer. MTI asserts that what was formerly an open and observable government process is now closed. It contends that the only opportunity that the public has for oversight of WERC's election administration is through public records. MTI explains that the need for oversight is revealed by the facts of record.

¶56 However, the majority omits these facts. WERC acknowledged various voter complaints during MTI's 2015 recertification election, including that an eligible voter's name was not in the system and a failure to receive confirmation that a vote had been counted. Absent from the majority opinion is the fact that Scott specifically acknowledged receiving various complaints about:

- A voter who was blocked from voting because she was told she had already voted;
- A voter who had submitted a ballot but did not receive confirmation that the vote was submitted;

- A voter's name that was missing from the eligible voter list, and;

- A voter who needed a new access code to submit a ballot.

¶57 When speculating about the intent behind these records requests, the majority also ignores the record evidence that MTI advised WERC that it "w[ould] not engage in voter coercion or any other illegal election practices during the upcoming election." MTI explained at oral arguments that it made these records requests to ensure WERC properly executed its election-administration duties.

¶58 The majority fails to take into account these facts of record that address the integrity of the election process. In other words, when conducting the balancing test, the majority erroneously relies solely on what it assumes is the intent behind the records requests. It ignores the evidentiary record which illustrates the importance of the policy behind the public records law: it "serves one of the basic tenets of our democratic system by providing an opportunity for public oversight of the workings of government." See majority op., ¶17 (citing Nichols v. Bennett, 199 Wis. 2d 268, 273, 544 N.W.2d 428 (1996).

II

¶59 The usual admonition is that if you do not have the facts, then argue the law. Conversely, if you do not have the law, then argue the facts. The majority has neither.

¶60 Here the majority fails to recognize and address recent precedent that impels a conclusion contrary to that of

7

the majority.  In Erpenbach, the MacIver Institute sought copies of correspondence sent to Senator Erpenbach's office related to 2011 Act 10.  354 Wis. 2d 61, ¶3.  Erpenbach agreed to provide some of the requested documents, but redacted the personal contact or identifiable information of the email senders.  Id. He justified the redactions in part on the context of the "nuclear environment" surrounding 2011 Act 10 debates, asserting that the redactions would protect the e-mail senders against unwanted threats, harassment or reprisals.  Id., ¶¶5, 22, 23.

¶61 The court disagreed, explaining that although Erpenbach identified threats and harassment levied against public officials and police officers, he did not identify actual threats, harassment or reprisals against concerned citizens. Id., ¶23.  Accordingly, it determined that Erpenbach failed to demonstrate "a reasonable probability" that the email senders "would be subjected to negative repercussions for sharing their views regarding the legislation."  Id.

¶62 Further, the court observed that "Erpenbach's generalized concern of possible threats, harassment or reprisals could apply equally to any controversial public policy."  Id., ¶24.  Indeed, the problem with relying on generalized concerns of harm when conducting the balancing test is that such concerns "would be in the eyes of the beholder," thus drawing courts into the political fray.  Id., ¶39 (Brown, C.J., concurring).

¶63 Neither Scott nor the majority contends that voter intimidation or coercion was probable during MTI's election. Rather, Scott referred to a "potential" for voter coercion, and

8

the majority suggests only that it is "entirely possible" that MTI would exert pressure on potential voters. Majority op., ¶34.

¶64 The mere possibility of voter intimidation or coercion they both raise falls short of establishing a reasonable probability that such harm would actually occur. Accordingly, this concocted concern should not be afforded significant weight in the balancing test. See Erpenbach, 354 Wis. 2d 61, ¶26.

¶65 Ignoring Erpenbach, the majority instead unpersuasively relies on non-public records cases, Burson v. Freeman, 504 U.S. 191 (1992) and WERC v. City of Evansville, 69 Wis. 2d 140, 230 N.W.2d 688 (1975). In Burson, the Supreme Court upheld a restricted zone around polling places to preserve the right to cast a ballot free from the taint of intimidation or fraud. 504 U.S. at 211. The concern examined in Burson was the right to vote and the secrecy of the ballot. Id. at 198-202. Conversely, at issue here is a request for the list of the names of those who have cast a ballot in an election——information that has historically been publicly available. Neither the right to vote nor the secrecy of the ballot is implicated in these public records requests.

¶66 In Evansville, the analysis relied heavily on evidence of actual threats or coercion, thus undermining the majority's reliance on generalized conjecture. 69 Wis. 2d at 153-157. The Evansville court examined extensive documentation of threats and coercive communications to employees, including threats of loss of benefits if employees engaged in union activities. Id. In

9

contrast, the record here lacks evidence of any actual coercion or threats by MTI.

¶67 Finally, when conducting the balancing test the majority takes into account that this recertification election was conducted electronically, rather than by paper ballot. Majority op., ¶¶30, 34. According to the majority, "[w]hen elections are conducted over a period of time and voting occurs in many locations, there is no physical boundary by which voter-intimidation can be regulated . . . ." Majority op., ¶34.

¶68 As MTI explained in its brief to the court, "[i]f WERC had conducted an election that required employees to cast ballots in person rather than electronically, MTI would have had no need to request the record, but could simply have had representatives present to observe the election firsthand, as allowed under the WERC's administrative rules."[4] MTI's counsel further explained at oral arguments that as a result of WERC's change in the administration of the certification election, "what was formerly an open and observable government process is now closed."

¶69 Unlike the majority, I would not permit a technological upgrade in the administration of an election to shield the release of records to which the public is rightfully

---

[4] Public union certification elections may be conducted "on-site or by mail or by other means determined by the commission to be fair and reliable." Wis. Admin. Code § ERC 70.07(1). "Any interested party may be represented by observers at on-site election locations and at locations at which vote counts are conducted." Wis. Admin. Code § ERC 70.07(3).

10

entitled. State ex rel. Milwaukee Police Ass'n v. Jones, 2000 WI App 146, ¶19, 237 Wis. 2d 840, 615 N.W.2d 190 ("A potent open records law must remain open to technological advances so that its statutory terms remain true to the law's intent.").

¶70 For the reasons stated above, I find unpersuasive the majority's determination that Scott "lawfully performed the balancing test in concluding that the public interest in elections free from voter intimidation and coercion outweighs the public interest in favor of openness of public records." Majority op., ¶3.

III

¶71 Applying the public records balancing test, I conclude that Scott has failed to overcome the strong presumption favoring the release of the requested records. See Linzmeyer v. Forcey, 2002 WI 84, ¶¶10-12, 254 Wis. 2d 306, 646 N.W.2d 811. "The duty of the [records] custodian is to specify reasons for nondisclosure and the court's role is to decide whether the reasons asserted are sufficient." Newspapers, Inc. v. Breier, 89 Wis. 2d 417, 427, 279 N.W.2d 179 (1979).

¶72 Before this court, Scott provides two[5] justifications for denying these public records requests: to protect the

---

[5] The first reason Scott provided to MTI in the denial letters was that because WERC utilized a third-party vendor to administer the election, WERC did not possess the requested records. Majority op., ¶7. However, the circuit court stated that "there was no attempt ever made to figure out if [Scott] could produce the documents," a conclusion that counsel for Scott conceded was accurate at oral arguments before this court. Counsel for Scott further explained that he abandoned this argument on appeal. Accordingly, I do not consider it when conducting the balancing test.

11

secrecy of the ballot and to avoid the potential for voter coercion during the election. Majority op., ¶7.

¶73 Scott's first argument——that disclosure would violate the secrecy of the ballot——rings hollow. Although the substantive votes on a ballot are confidential, the identity of those who voted is not.[6] Disclosing the names of those who have cast a ballot prior to the conclusion of an election does not violate the secrecy of the ballot. At oral argument, counsel for Scott aptly explained the distinction between the act of voting and the secrecy of the ballot:

> The act of voting is never secret. The ballot is certainly secret. After an election is finished, no ballot will ever be disclosed. The act of not voting is a non-vote, but the Chairman decided that because of transparency after the election . . . The act of not voting is not given the same protection as the ballot.

¶74 Additionally, Scott undermined his purported concern about protecting the secrecy of the ballot by releasing the names of those who voted after the conclusion of the election. I agree with the circuit court that refusing to disclose the names of voters during the election but releasing that information after the election is "entirely contradictory" and

---

[6] See Wis. Stat. § 6.36(1)(a)(1),(7)&(1)(b)1 (clarifying that the official voter registration list in Wisconsin—— including the names and dates of any election in which the elector votes——is a public record "accessible by any person"); Wis. Stat. § 6.79(2)-(3) (voters must state their names and present proof of identity at polling places before they may vote); Wis. Stat. § 7.41(1) (members of the public may observe elections at polling places); see also Wis. Admin. Code § EL 3.50(2)-(3); Wis. Admin. Code § ERC 70.07(3).

12

"paradoxical." Accordingly, I afford Scott's purported concern about maintaining the secrecy of the ballot little weight in the balancing test.

¶75 Scott's second argument that denying these public records requests was necessary to prevent "the potential for voter coercion while balloting is ongoing" is similarly unconvincing. As discussed above, Scott failed to provide any evidence that MTI ever attempted to coerce or intimidate voters in this, or any other, recertification election. Moreover, Scott did not provide any substantiated evidence that intimidation or coercion occurred in any other recertification election in Wisconsin. Thus, I conclude that Scott failed to establish that it was reasonably probable that such harm would occur in MTI's 2015 recertification election.

¶76 Ensuring the integrity of elections is an important public interest. For that reason, the legislature empowered WERC with tools to investigate and penalize unfair labor practices, including voter coercion. See Wis. Stat. § 111.07. The legislature did not, however, carve out an exception to the public records law permitting WERC to withhold records that historically have been accessible to the public.

¶77 In sum, I conclude that Scott failed to overcome the presumption that all public records shall be open to the public. Unlike the majority, I determine that the unfounded speculation that the records might be used for improper purposes does not outweigh the strong public interest in opening the records to

13

inspection. Accordingly, I would affirm the circuit court's determination that Scott violated the public records law.

¶78 For the foregoing reasons, I respectfully dissent.

¶79 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

14